Ray HOUGH, Plaintiff-Respondent,

v.

RAPIDAIR, Inc., a Corporation, Defendant-Appellant.

No. 45277.

Supreme Court of Missouri, Division No. 1.

Jan. 14, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied Feb. 11, 1957.

J. W. Grossenheider, Lebanon, for appellant.

Wear & Wear, Springfield, for respondent.

VAN OSDOL, Commissioner.

This is an action to recover $53,000 for personal injuries and property damage alleged to have been sustained by plaintiff, Ray Hough, when his Temco Swift, No. N77756, a low-wing airplane, crashed at or near the Springfield Municipal Airport. Plaintiff had alleged that defendant, Rapidair, Inc., was the owner of a Piper J–3, No. N2069M, a high-wing airplane, being piloted by defendant's employee, Robert D. Fiedler; that at approximately 4:45 in the afternoon of February 6, 1955, plaintiff was operating his airplane in making a standard routine landing at the airport and was severely injured in the crash of his airplane which was caused by the negligent operation of defendant's aircraft. Defendant, Rapidair, Inc., denied generally, and alleged plaintiff's contributory negligence. The theories of plaintiff's case and of defendant's defense were upon negligence in alleged violations of the Air Traffic Rules prescribed by the Civil Aeronautics Board pursuant to 49 U.S.C.A. §§ 425(a) and 551(a). At the conclusion of the trial, plaintiff's case having been submitted, the jury returned a verdict for defendant. The trial court, however, sustained plaintiff's motion for a new trial, and defendant has appealed from the new-trial order.

The grounds upon which the trial court sustained plaintiff's motion for a new trial were error in giving defendant's Instruction No. 4, and errors in the admission of evidence. Defendant-appellant raises the basic contentions that plaintiff failed to make out a submissible case, and that plaintiff was contributorily negligent as a matter of law. In examining these contentions we shall set out and consider the evidence from a standpoint most favorable to plaintiff.

The Springfield Municipal Airport, located northwest of the City of Springfield, has an airstrip or runway 31 lying in a southeast-northwest direction (a heading of 310 degrees).

Plaintiff (piloting his privately operated Swift airplane in intrastate flight from Joplin to Springfield with one Turner Platt, a friend, as a guest passenger) radioed the

control tower at the Springfield airport when his airplane was seven or eight miles west of Springfield. The tower gave plaintiff information as to wind velocity and direction ("north, northwest"); and told plaintiff he was to use runway 31 in landing.

Plaintiff testified that, in approaching the airport, he searched the area for other aircraft and, observing that no airplane was on the same level (800 feet), moved into the traffic pattern and continued on the downwind leg, "put my wheels down," and turned to the left into the base leg. About that time he received a radio communication from the tower. He was told that he was "number two to land, and to follow the Aeronca, which was on a short base." The Aeronca "went in and landed." Plaintiff was then "about a half to three-quarters (of a mile) out from the end of the runway." He turned left "on final approach," established his glide toward runway 31, and put the "flaps down." He immediately saw a green airplane slightly to the left in his glide path on a collision course. The green airplane, a Piper J–3, was approximately, "I would judge, 100 feet, right there, right in front of me. And I pulled the nose up to keep from hitting it, with my left hand turned the wheel to the right, banked to the right, added full throttle with my right, all the same time. At the same time, the tower was saying something, Turner had said something. And the plane quivered, indicating a stall. I pushed the nose down to gain speed, and turned my controls back to the left to level my wings, and about that time—by that time I was down behind the tops of these trees, and that is the last I remember until I woke up about three or four weeks later in the hospital."

Turner Platt, the passenger in plaintiff's Swift, testified that plaintiff had brought the airplane in on the final approach in a normal manner. The witness was of the opinion that if defendant had not taken evasive action plaintiff's plane would have collided with the Piper J–3.

One Loren E. Thomas, Jr., and his wife, Paula Sue, testified that they were sitting in their automobile parked ,to the northward of the administration building at the airport. Loren testified that he "saw Mr. Hough's plane * * * coming in for a landing and, seemingly, this other plane came in from the south, and * * * cut across his path as he was making the landing. * * * Well, from where I was sitting, looked like Mr. Hough pulled up to the right just a little, to try to avoid an accident, and his plane stalled, and fell." The J–3 continued in flight around the airport. The J–3 "didn't fly around the runway pattern; just went opposite direction to it,—I mean across it." The witness thought the two planes, at the time, were "around two hundred feet (in altitude), something like that." Paula Sue testified, "I just happened to look off, and we saw this plane just cut right in front of the other one, and that is about all I could say * * *."

Elmo V. Boswell, one of the two airport employees on duty in the tower, testified that at 4:30 in the afternoon plaintiff had called and reported his position as eight miles west of the airport. The witness told plaintiff the wind direction and velocity, the barometric pressure, and that he was to use runway 31. When plaintiff's airplane was first sighted from the tower, the witness called plaintiff and gave him the transmission—"Swift 756, Number two to land, follow the Aeronca on a short base leg." When this message was transmitted, plaintiff was turning to his "downwind (southeastward) leg." At that time the Piper J–3 was in the traffic pattern just coming out of a turn, "after a takeoff, turning to the left." When the Piper J–3 was turning "from his downwind leg to his base leg (perpendicularly to or at right angles with runway 31)," and "Mr. Hough was just about to turn on his final approach," the witness, using the "highly directional" light gun, flashed a red light signal on the airplane (Piper J–3). "* * when there are two aircraft headed a cer-

tain direction, that is what we call a hazard, so we put the red light on this J–3 to be sure that he would not come in and land in the path of another airplane." The witness held the red light "on him (the J–3) all the way across the base leg," but the J–3 aircraft continued on in an easterly heading until it was approximately over the runway. Almost simultaneously (that is, in possibly "a few seconds" after the witness had directed the red light on the J–3), Nelson D. Harpine, the other airport employee in the tower, snatched up the microphone and transmitted a message to plaintiff as follows, "Swift 756, do you have the light aircraft in sight turning in ahead of you? I have no control over him,—but take it around."

We shall refer to other evidence in the further course of this opinion.

■ The initial argument in support of defendant-appellant's contention that plaintiff failed to make out a submissible case relates to the questions whether the Piper J–3 involved was in fact under the control of defendant, and whether the person operating the J–3 involved was in the employ of defendant. On these issues, we have examined the testimony of the president of defendant corporation, Roscoe Prescott, who was called to the witness stand by plaintiff. Prescott testified that at the time plaintiff was injured a Piper J–3, No. N2069M, was being piloted by one Robert D. Fiedler, according to defendant's records. The Piper J–3 had been leased by and was under the control of defendant— it was later purchased by defendant. The business of defendant includes student instruction. Prescott testified that, at the time, Fiedler was working for defendant in instructing one Mayfield, a student. Again in his testimony, Prescott identified a Piper J–3 (shown airborne in a photographic exhibit) as the very J–3 which had been leased and which later had been purchased by defendant—"*the one in question.*" The witness, Harpine, who, as stated, was on duty in the tower, testified

that a Piper J–3 was in the traffic pattern between the hours of 4:25 and 5:25 of February 6th, "he was making a continuous circle, doing touch-and-go landings." The witness Boswell, who, as stated, was also on duty in the tower, testified that the Piper J–3, No. N2069M, was in the traffic pattern at the time the witness transmitted to plaintiff the message—"Number two to land, follow the Aeronca on a short base leg"—and that so far as the witness knew the Piper was being flown by Fiedler and a student. The pilot Fiedler did not testify. It would seem there were in fact no real issues as to the identity of the Piper J–3 and of Fiedler as being defendant's aircraft and the pilot of defendant's aircraft involved in the asserted mid-air, "near miss" collision. However that may be, there was substantial evidence tending to show that defendant's J–3 was the aircraft involved, and that Fiedler was piloting the J–3 as the employee of defendant in the course and within the scope of his employment.

■ In this case liability should be determined by the law of Missouri applicable to torts on land. Sections 305.040 and 305.050 RSMo 1949, V.A.M.S.; Uniform Aeronautics Act, §§ 6 and 7, 11 U.L.A. at pages 163–164. The standard of care in this case is prescribed by the common law principles of negligence. Linam v. Murphy, 360 Mo. 1140, 232 S.W.2d 937; § 305.-040, supra; Parker v. James E. Granger, Inc., Cal.App., 39 P.2d 833, affirmed in Parker v. James E. Granger, Inc., 4 Cal.2d 668, 52 P.2d 226, certiorari denied 298 U. S. 644, 56 S.Ct. 958, 80 L.Ed. 1375; Rhyne, Aviation Accident Law, pp. 58–59 and 61– 62. As we have said, plaintiff in his petition and defendant in its answer alleged negligent operations of aircraft in violation of the Air Traffic Rules of the Civil Air Regulations promulgated by the Civil Aeronautics Board; and we note that the trial court in plaintiff's principal verdict-directing Instruction No. 3 set out certain of the Air Traffic Rules and instructed the jury that the violation of such Rules "was

negligence." We have the opinion that, in this case, violation of the Rules is not to be considered negligence as a matter of law. Compare Herrick v. Curtiss Flying Service (not officially reported) N. Y. Nassau Co., 1932 U.S. Av. R. 110; and see Rhyne, Aviation Accident Law, pp. 88–89; and Notes, Vol. 4, The Journal of Air Law and Commerce (1933), pp. 103–108. In this case we think the question of negligence was for the jury. This is not to say the Rules promulgated pursuant to Federal statute were not to be judicially noticed, Section 490.080 RSMo 1949, V.A.M.S. and considered as if in evidence; and we see no reason that a trial court in its discretion should not permit pertinent rules to be read into evidence; or that a violation of the substance of pertinent rules should not be hypothesized for a jury finding of negligence. The speed and variable three-dimensional movement of aircraft in flight require precautions to be taken in the exercise of due care in the circumstances of flight necessarily, in many respects, different from those precautions recognized by Missouri law to be taken, in the exercise of prescribed standards of care, in horse-drawn, automotive or locomotive operation restricted to movement on a horizontal plane. Linam v. Murphy, supra. And we bear in mind that we are enjoined to interpret the Uniform Aeronautics Law, Sections 305.010 to 305.110 RSMo 1949, V.A.M.S. so as to harmonize the law of this state, as far as possible, with Federal laws and regulations on the subject of aeronautics. Section 305.070 RSMo 1949, V.A.M.S. Consequently, we believe the Rules promulgated by Federal authority in promoting safety in flight in Air Commerce and in developing and regulating Air Transportation, 49 U.S.C.A. §§ 402 and 551, matters of national concern, may be considered as applicable in evidencing the safe flying procedure one in aerial flight would and should ordinarily and customarily observe, and would have reason to believe would be observed by others in aerial flight at the Springfield Municipal Airport (as well as throughout the United States). This is to say that, in this Missouri negligence case, we believe the (pertinent) Rules were properly considered in evidence and were of value to the trial court and to the jury in submitting and determining the issues of negligence in failing to take the precautions commensurate with the dangers to be reasonably apprehended in the shown circumstances of this case.

The evidence in our case was substantial in tending to show that, when plaintiff was in final approach for landing and had moved down to an altitude of approximately two hundred feet, defendant's airplane, which was then flying at approximately the same altitude, was approaching on the left of plaintiff's Swift. In this situation, in accordance with Rule 60.14(b) of the Air Traffic Rules, the defendant's J–3 should have given way to the aircraft (the Swift) approaching on the right of the J–3; and in accordance with Rule 60.14(e), the Swift, being on final approach to land, had the right of way over other aircraft in flight. Even assuming the J–3 was moving at a lower altitude than the Swift and assuming that both aircraft were approaching the airport for the purpose of landing, in which case the J–3 would have had the right of way, yet the J–3 was not to take advantage of this rule to "cut in in front of another which is on final approach to land." Rule 60.14(e), supra.

The testimony of the two employees of the airport on duty in the tower is substantial in tending to show there was the hazard that the course of the flight of the J–3 would bring that aircraft into collision with the Swift. The J–3 was "turning in ahead of" the Swift. The airport employees "put the red light" on the J–3 to make sure that "he would not come in and land in the path" of the Swift. In this connection, we notice the evidence that the J–3 had no radio equipment; and that the pilot of the J–3 did not obey the red light signal and piloted his aircraft into and across the "path" of the Swift. It is argued that, when the J–3 was turning from

the downwind leg to the base leg, its pilot could not maintain visual contact with the tower because (the J–3 being a "high-wing" aircraft) the wing of the J–3, in that aircraft's left turn into its base leg, obstructed the pilot's view of the tower. However, the witness Boswell testified that he held the red light on the J–3 "all the way across the base leg"; and there was other testimony that the base leg of the J–3 was a "rectangular" one, which descriptive word, as we understand it, indicated that the J–3 righted in flight and leveled off in moving "across," perpendicularly or at right angles to the runway and to the approach of plaintiff's Swift. But, assuming the pilot of the J–3 could not see the tower and the red signal beam, a jury could reasonably find that he, nevertheless and with all the more vigilance, should have maintained a lookout for and avoid other air traffic (Rule 60.12), especially, it would seem, air traffic to the right of the J–3, and aircraft making final landing approach.

■ We are of the opinion the evidence was sufficient and substantial in tending to show that defendant's aircraft was negligently operated and that such negligent operation was a proximate cause of bringing the two aircraft into convergent flight and near collision.

As we have said, it is further contended that plaintiff was contributorily negligent as a matter of law.

There was a conflict in the testimony relating to the meaning of the transmission— "Number two to land, follow the Aeronca on a short base leg." It was the testimony of the witness Boswell that this was a "landing sequence," as distinguished from a "clearance to land." However, there was testimony of experienced pilots that the quoted transmission was a clearance to land. One of these witnesses testified that if he were piloting "number two" and if "I have the plane in sight who is number one, I will follow him on in," unless "that clearance was revoked * * *." There was evidence that, when plaintiff was given the transmission—"Number two to land, follow the Aeronca on a short base leg"—plaintiff was turning from his downwind leg into a base leg, and the Piper was turning into its downwind leg; and that, when plaintiff was just about to turn on his final approach, the J–3 was turning from its downwind leg into its base leg. Upon being cleared for landing and becoming committed to his final approach, it could be reasonably said plaintiff had reason to assume pilots of other aircraft would recognize that his aircraft had the right of way over other aircraft and especially over aircraft approaching from his left; and we do not doubt that a jury could reasonably suppose that, at that time, his visual attention should be the more concentrated on the safe landing of his aircraft on the runway. It is true the tower undertook to countermand or revoke plaintiff's clearance to land; but there was evidence from which the jury could reasonably infer the countermand was transmitted too late. The inferences are reasonable that the altitude of the "low-wing" Swift, which had approached and entered the traffic pattern at the altitude of eight hundred feet, was higher than that of the J–3 until the Swift, in the glide of its final approach, came down to the approximate altitude of two hundred feet, and that plaintiff theretofore could not have seen the J–3. But if it be assumed that, when he was just about to turn on his final approach, plaintiff could have seen the J–3, a jury could reasonably find that he would have seen the Piper J–3 was turning from its downwind leg and that he would have had no reason to apprehend that the Piper J–3 would continue in a movement through its base leg and directly in front of plaintiff's plane when it was in its final approach for landing on the right of the J–3.

In support of its contention that plaintiff was contributorily negligent as a matter of law, defendant-appellant has cited Burton v. Moulder, Mo.Sup., 245 S.W.2d 844; Branscum v. Glaser, Mo.Sup., 234 S.W.2d 626; and Folluo v. Gray, Mo.App.,

256 S.W.2d 273. The circumstances which are to be taken into account in examining the question of contributory negligence were different in the cited cases to those obtaining in our case. Particularly, and for examples of the differences in the circumstances, in the Burton and Folluo cases there were the circumstances that defendants were approaching from plaintiffs' right. In the Branscum case, plaintiff had stopped at a stop sign, and then, manifestly without looking, drove into an intersection and in front of defendant's vehicle plainly to be seen approaching at a high rate of speed. Herein we are examining our question by taking into account the facts and circumstances of our case.

It is argued by defendant-appellant that the circumstances of the convergence of the two aircraft in flight were not such as would prompt one in the exercise of due care into taking evasive action; and, moreover, that the evasive action taken by plaintiff, that is, pulling "the nose up" and banking "to the right," was not proper evasive procedure—it is said that the proper evasive action would have been to "nose down" and bank "to the left." However that may be, there was evidence from which the jury could reasonably infer that a collision of the two craft was imminent, and that plaintiff had reason to apprehend danger in the situation which made immediate evasive action necessary; so we do not wish to say as a matter of law that the particular evasive action taken by plaintiff, even though another course of action would have been safer, should not be determined by a jury from the standpoint of an ordinarily prudent person who is confronted by a sudden emergency brought about by the negligent conduct of another.

We believe the question whether plaintiff was guilty of negligence directly contributing to his injury was a jury question.

We hold the trial court did not err in submitting plaintiff's case to the jury.

At defendant's request the trial court gave Instruction No. 4, submitting plaintiff's contributory negligence as follows,

"The court instructs the jury that even though you find and believe from the evidence that the defendant was negligent as defined in the other instructions, yet if you further find and believe from the evidence that the plaintiff, Ray Hough, failed to exercise ordinary care in the operation of the aircraft he was flying in that he failed to operate his aircraft in the traffic pattern ordinarily used by similar type light aircraft as mentioned in the evidence, if you so find, or in that he attempted to cause his said aircraft to make its final approach toward Runway 31 mentioned in the evidence, if so, when ordered by the control tower not to so operate his aircraft, if you so find, or in that as he made his final approach to Runway 31, if you so find, he failed to see the J-3 aircraft mentioned in the evidence approaching Runway 31 on its base leg, if you so find, until the said J-3 aircraft was approximately 100 feet in front of him, if you so find; if you find that these were the facts and that the plaintiff, Ray Hough, was thereby negligent and that said negligence, if so, directly contributed to cause the crash and the injuries of which plaintiff complains, then you must find the issues for the defendant."

The testimony relied on by defendant as tending to show plaintiff was contributorily negligent in failing to follow a normal traffic pattern, pertained to the movement of plaintiff's airplane in a wide circle in approaching the point where he turned on final approach. The witness testified, "I would say it was not exactly regulation traffic pattern." However, the witness said the normal practice "is variable; it is hard to say * * *." We think there was no substantial evidence of negligence in failing to follow the normal traffic pattern; and, moreover, there is a dearth of evidence supporting a reasonable conclusion that such negligence, if

so, was a cause directly contributing to the near collision and crash which occurred after plaintiff was committed to and during his landing approach. Since there was no substantial evidence supporting negligence (and causation) of plaintiff's operation "of the aircraft he was flying in that he failed to operate his aircraft in the traffic pattern ordinarily used by similar type light aircraft" as submitted in the first disjunctive or alternative submission of contributory negligence in Instruction 4, the instruction was erroneous and, for that reason alone, the trial court correctly sustained plaintiff's motion for a new trial. Carlisle v. Tilghmon, Mo.Sup., 159 S.W.2d 663. Furthermore, there were no facts hypothesized in the instruction which would support the other two disjunctive or alternative submissions of negligence (and third disjunctive submitted negligence in failing to see, without an hypothesis of when, in the exercise of ordinary care in looking, he should have seen). Although we have considered the evidence in determining the submissibility of plaintiff's case from a standpoint favorable to plaintiff, the evidence introduced by the adversary parties tended to support conflicting and complicated factual theories as to distances and directions of the one aircraft from the other and from the runway and tower, and as to the altitude of the respective aircraft in their flight and approach to each other and to the runway—all tending to bear upon and support and refute the disputed issues of whether plaintiff should have seen or sooner should have seen the approach of the J–3 and in time to have sooner diverted the flight of his aircraft in avoiding the near collision, and of whether the countermand of the landing clearance was sufficiently timely for plaintiff to have heard and acted in modifying the approach glide of the Swift and "take it around" the traffic pattern.

Upon a retrial and resubmission, a careful study should be made of the conflicting factual theories to the end of fairly submitting the issues of defendant's negligence and plaintiff's contributory negligence. The instructions submitting such issues should follow this court's advice in Hooper v. Conrad, 364 Mo. 176, at pages 188–189, 260 S.W.2d 496, at pages 500–501, wherein, in qualifying and refining Knight v. Richey, 363 Mo. 293, 250 S.W.2d 972, this court said, "Where the evidence presents two or more divergent sets of essential facts, under one or more of which plaintiff would be entitled to recover and under one or more of which he would not, then a verdict-directing instruction or instructions given in his behalf should hypothesize, either by recital or by reference to other instructions, the facts essential in law to support the verdict. In like manner, verdict-directing instructions in behalf of the defendant should recite on their face or by reference to other instructions any essential fact or facts shown or not shown which will defeat plaintiff's right of recovery. Where there is no divergence in or denial of the essential facts, then the ultimate issue of the negligence pleaded and its being the proximate cause of the injury or damage alleged may be submitted by reference to the facts and circumstances shown by the evidence without specific hypothesization in the instructions. And, we may add, that if either of the parties deems a hypothesized fact or situation not to have been clearly or sufficiently hypothesized in any instruction, he should offer a clarifying or amplifying instruction."

We do not know what trial course the parties will pursue, or what evidence and in what connection they may choose to introduce upon a retrial of this case. The trial court and the parties upon retrial should have in mind the contentions relating to questioned evidence, the admission of which was considered erroneous by the trial court in ruling the instant motion for a new trial. Our cursory examination does not indicate the admission of the questioned evidence was *error* in the true sense of meaning of that term; but we specifically do not rule this question. We think we

should not unnecessarily prolong this opinion by treating with contentions relating to the admission of evidence, the proffer of which may or may not recur.

The order granting a new trial should be affirmed.

It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.