Garry V. GIDDENS, Respondent,

v.

The KANSAS CITY SOUTHERN
RAILWAY COMPANY,
Appellant.

No. SC 82602.

Supreme Court of Missouri,
En Banc.

Oct. 17, 2000.

Rehearing Denied Nov. 14, 2000.

Harlan D. Burkhead, Kansas City, for Appellant.

Patrick S. O'Brien, Newton G. McCoy, St. Louis, for Respondent.

## PER CURIAM.[1]

In 1989 Garry V. Giddens was injured while working for his employer, Kansas City Southern Railway Company (KCS). The injury occurred when a chain attached to a crane broke causing a track assembly to fall on Giddens' hand. Treatment for the hand injury included eight surgeries. Despite the treatment, Giddens was unable to return to work. He then filed suit against KCS under the Federal Employer's Liability Act (FELA). In this third

trial of the suit, the trial court entered a $1,520,000 judgment for Giddens.[2] KCS appeals the judgment, asserting six claims of error. Finding that the trial court committed no prejudicial error, the judgment is affirmed.

Considered in the light most favorable to the verdict, the evidence at trial showed: In 1989, Giddens was a foreman for KCS' maintenance-of-way department, which constructs and maintains the railroad's roadbeds and right-of-way. In May 1989, heavy rains in Louisiana caused "washouts," i.e., areas where the ballast under the ties and the rail are washed away, leaving the rail and ties suspended without roadbed support. Wash-out repair was not within Giddens' general duties, but KCS assigned him and his crew to wash-out repair.

On May 18, 1989, Giddens' supervisor, Larry Dobson, instructed him to begin repair work at milepost 612 and told him that a KCS locomotive crane would be there. Giddens and his crew were told to use the chains located on the crane to lift the tracks out of the way while cross-tie supports were inserted underneath the tracks.

On May 19, Giddens and his crew began to repair the wash-out damage at milepost 612. Giddens had never before performed wash-out repair by using a crane. At the work site, a division engineer instructed Giddens to use a backhoe to move all of the old fill and mud in the surrounding area underneath the suspended track. This would build a foundation more quickly than would stacking the cross-tie support. The engineer said that, if the old mud did not completely refill the hole under the tracks, Giddens and his crew could "shim"

1. This appeal was originally decided by the Court of Appeals, Western District, in an opinion by the Honorable Laura Denvir Stith. Portions of that opinion are incorporated without further attribution.

2. At the first trial in 1994, the jury awarded Giddens $500,000. The trial court granted a

new trial due to failure to give an instruction on mitigation of damages. At the second trial in April 1995, the jury awarded Giddens $1,400,000. The trial court again awarded a new trial, this time on the basis of an improper closing argument by Giddens' counsel.

the landfill by taking ties and building a box structure on top of the fill.

Giddens and his crew climbed up the sides of the mud-filled foundation in order to build up a mini-crib on top of the mud. As Giddens inserted a tie underneath the track, he placed his left hand on top of the tie to steady himself. While his hand was on top of the tie, the chain from the crane holding the track assembly broke, causing the suspended track to drop and pin Giddens' left hand between the tracks and the tie at the top of the crib. After approximately three to five minutes, those at the scene were able to attach the chain back to the crane and lift the track off Giddens' left hand.

Giddens received hospital emergency treatment and was subsequently treated by a hand specialist. He suffered crush-type fractures of the middle, ring, and small fingers of his left hand. Several reconstructive surgeries were performed on his left hand to repair the damage. While Giddens was receiving the initial treatment for his hand injury, he was not permitted to return to work. He remained on KCS' payroll through its wage continuation program.

Giddens' injury was sufficiently severe that he was not released to return to work for KCS until June 1990. In December 1990, Giddens left work for vacation and additional tendon surgery. He returned to work in May 1991. In December 1991, Giddens again took a vacation and underwent additional surgery. Two months later, Giddens attempted to return to work, but a KCS physician disqualified him from work because of safety concerns regarding his ability to lift heavy objects. Subsequent surgeries followed. In the summer of 1992, Giddens attempted to return to work again, but failed a KCS field test. At this time, Giddens was notified that he would be taken off the wage continuation program as of October 1992.[3]

Giddens filed this suit in November 1992. He filed interrogatories and a request for production asking for the names of persons who had obtained written statements from Giddens, including a video or motion picture of him, and for copies of those statements and videotapes. No videotapes were taken at that time.

Before the third trial, KCS hired an investigator to watch Giddens. The investigator made videotapes of his surveillance in April 1997. These were sent to counsel for KCS on May 16 and June 3. The videotapes showed Giddens performing various activities, including raking leaves, sweeping and clearing natural debris, breaking tree branches and sticks, carrying tree limbs, gathering trash, and mowing the lawn with a push mower. In some parts of these videotapes, Giddens appeared to be using his injured hand to hold or push items.

On July 3, KCS conducted a supplemental deposition of Giddens. The existence of the videotapes had not been disclosed to Giddens. At the deposition, counsel for KCS again questioned Giddens concerning the physical limitations associated with his injured hand-this time specifically addressing the types of activities captured on the video surveillance. KCS asserts that Giddens' answers as to his ability to perform various activities were seriously at odds with what the videotapes showed he could do in at least ten respects. According to Giddens, his testimony and the videotapes are not inconsistent, since the questions were vague or dealt with abilities not depicted in the videotapes in various respects.

On July 8, KCS served an amended discovery response advising Giddens of the existence of the videotape surveillance. Giddens' attorneys subsequently deposed the investigator who performed the video surveillance. He explained when and how he obtained the videotapes and sent them to counsel for KCS.

---

**3.** Although Giddens was taken off KCS' wage continuation program, he remained eligible for disability pension benefits under the Railroad Retirement Act.

Giddens then filed a motion to exclude the video surveillance tapes from evidence on the basis that KCS failed seasonably to divulge information regarding the videotapes by keeping them secret until after Giddens' supplemental deposition. The motion also requested such other relief as the court deemed proper, including striking KCS' pleadings or imposing other sanctions.

Giddens' motion was not ruled until the day of trial January 13, 1998. The judge held that KCS had violated discovery rules by failing seasonably to supplement its interrogatory answers concerning its videotape "statements" of Giddens. The judge did not exclude the videotapes as a sanction for the discovery violation, however, because he believed the tapes might be needed so that the jury could see what activities Giddens could perform. Instead, he sanctioned KCS by prohibiting use of Giddens' post-surveillance deposition testimony, even for impeachment purposes.

At trial, Giddens testified about his physical condition and limitations. His answers were consistent with what the videotape surveillance showed about his condition. His prior trial testimony was not used to impeach him. His testimony was not fully consistent with portions of his excluded deposition testimony, which indicated a more limited physical capacity.

Giddens also provided testimony from three expert witnesses, including: (1) a railroad specialist who testified as to the alleged deficiencies in KCS' operations; (2) a psychologist-rehabilitation specialist who testified as to his injuries and his rehabilitation; and (3) an economist who testified as to his lost wages. Giddens further introduced OSHA regulations allegedly violated by KCS as evidence of KCS' negligence in operating and maintaining the work site.

The court entered judgment in accordance with the jury's verdict. All KCS post-trial motions were overruled. KCS appeals.

■ KCS challenges the submissibility of Giddens' case and argues that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict (JNOV). The standard of review of denial of a JNOV is essentially the same as for review of denial of a motion for directed verdict. A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. *Houghton v. Atchison, Topeka & Santa Fe Railroad Co.*, 446 S.W.2d 406, 409 (Mo. banc 1969). In determining whether the evidence was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict. *Id.* This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Seitz v. Lemay Bank and Trust Co.*, 959 S.W.2d 458, 461 (Mo. banc 1998).

■ Under FELA, the employer has a duty to provide its employees with a reasonably safe place to work. If the employer's negligence plays any part, even the slightest part, in producing the employee's injury, then a submissible case is made. *Qualls v. St. Louis Southwestern Ry. Co.*, 799 S.W.2d 84, 85–86 (Mo. banc 1990). Contributory negligence by the employee will not bar recovery but may diminish the amount of recovery in proportion to the amount of employee negligence. *Wilmoth v. Chicago, Rock Island and Pacific R. Co.*, 486 S.W.2d 631, 636 (Mo.1972).

KCS asserts an exception to the usual comparative fault rule applies here because, as foreman, Giddens was in charge of the job site and assumed an independent duty to follow KCS' safety rules. Those rules precluded him from putting his hand under the railroad tracks while they were raised. However, the cases cited by KCS conflict with the adoption of a comparative fault system under which em-

ployee negligence is not used as a complete bar to recovery, but merely as a reduction to the recovery. *Id.* KCS' reliance on *Walker v. Lykes Bros. S.S. Co.,* 193 F.2d 772 (2nd Cir.1952), is misplaced as it is a Jones Act case rather than a FELA case.

■ Viewing the evidence in the light most favorable to Giddens, there was evidence that Giddens was inexperienced in both crane use and wash-out repair, that KCS failed to provide the proper equipment to perform the wash-out repair, and that the working conditions were unsafe. A jury could reasonably infer from this evidence that KCS was negligent in providing an unsafe work environment and that its lack of care played at least some part in Giddens' injury. Although KCS' evidence contradicted Giddens' testimony, and although KCS argues that its testimony was more credible and cast serious doubt on Giddens' version of events, it was up to the jury to make its own credibility determinations as well as any inferences of negligence from the evidence.

The trial court did not err in overruling KCS' JNOV motion.

■ KCS also challenges errors by the trial court in ruling on the admission of evidence, in imposing sanctions for discovery violations and in instructing the jury. The trial court is vested with broad discretion regarding rulings on the admission of evidence and the imposition of sanctions for discovery violations. Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Anglim v. Missouri Pac. R.R.,* 832 S.W.2d 298, 303 (Mo. banc), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992). The failure to submit an instruction to which a party is entitled is error, but such error will warrant reversal only when the merits of the action have been materially affected and when the error is properly preserved. *See Goff v. St. Luke's Hosp. of Kansas City,* 753 S.W.2d 557, 564 (Mo. banc 1988).

KCS asserts the trial court erred in concluding that KCS failed seasonably to supplement discovery and in imposing a discovery sanction by barring introduction of Giddens' videotaped deposition testimony at trial. KCS asserts that: (1) its supplementation of its interrogatory answers was seasonable in that it notified Giddens of the videotapes at least seven months prior to trial, and (2) even if its supplementation was not seasonable, barring introduction of the deposition testimony for impeachment purposes was error because it prevented the jury from knowing that Giddens had previously testified under oath inconsistently with his testimony at this trial and, thus, was not a credible witness.

■ Here, the trial court imposed a sanction for a discovery violation in connection with a failure to reveal timely the videotape surveillance of Giddens. Rule 56.01 allows discovery of a party's statements concerning the action, as follows:

A party may obtain without the required showing a statement concerning the action or its subject matter previously made by that party. For purposes of this paragraph, a statement previously made is: (a) a written statement signed or otherwise adopted or approved by the person making it, or (b) a stenographic, mechanical, electrical, audio, *video, motion picture* or other recording, or a transcription thereof, of the party or of a statement made by the party and contemporaneously recorded.

Rule 56.01(b)(3) (emphasis added). A videotape of a party constitutes a "statement" of the party within the meaning of Rule 56.01. *State ex rel. Missouri Pacific v. Koehr,* 853 S.W.2d 925 (Mo. banc 1993). The video surveillance tapes in this case are discoverable.

As previously noted, by interrogatories propounded in 1993, Giddens asked KCS

whether it had any knowledge of videotapes of Giddens taken since the time of the accident. In its original response, KCS answered in the negative, for at that time it had no such videotapes. Under Rule 56.01(e), a party has an obligation seasonably to amend its answer to an interrogatory if an initial response becomes inaccurate due to later events. That rule requires:

> **(e) Supplementation of Responses.** A party who has responded to written interrogatories with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:
>
> . . .
>
> (2) A party is under a **duty to amend a prior response seasonably** if the party obtains information upon the basis of which a party knows that the response (A) was incorrect when made or (B) though correct when made is no longer true.

Rule 56.01(e) (emphasis added).

Here, the parties agree that under *Koehr* and Rule 56.01(e) KCS had a duty seasonably to supplement its prior interrogatory answers by informing Giddens in writing of the existence of the videotapes. The parties disagree whether KCS' supplementation was "seasonable" and whether the court properly sanctioned KCS.

■■■ The construction given by the federal courts to their rules does not control the interpretation of our state rules, even if the rules themselves are nearly identical. However, the experiences of those courts in applying rules similar to our own are illustrative. *Martin v. City of Washington,* 848 S.W.2d 487, 495 (Mo. banc 1993). Federal Rule of Civil Procedure 26(e)(2) is similar to our Rule 56.01(e). Both require a "seasonable" amendment to prior responses to interrogatories. For purposes of the federal rule, supplementation need not be made as each item of information is learned but should be made at appropriate intervals during the discovery period, with special promptness as the trial date approaches. Fed. R.Civ.P. 26(e), *Advisory Committee Note 1993.* In this case, the videotapes were disclosed within two months of the time they were made and seven months before trial. This is more than sufficient time to allow a party to prepare for trial.

Giddens contends that consideration of the time to prepare for trial is not the only criteria. He urges that he was prejudiced because the videotapes were not disclosed prior to his last deposition. Revelation of the videotapes prior to the supplemental deposition could only be prejudicial if Giddens were to lie at his supplemental deposition, and the rules are not intended to provide a means by which a plaintiff may avoid the truth or avoid being caught in a lie. If Giddens is completely truthful in his answers to questions propounded at the deposition, then no prejudice occurs. Although the time to prepare for trial is not the only factor in determining if a supplemental disclosure is seasonable, in this case Giddens fails to show any prejudice or any other factor indicating a lack of seasonable supplementation. *Koehr* does not require a different result. That case involved answers to interrogatories in the first instance not—supplementation. The trial court abused its discretion in finding that the videotapes were not seasonably disclosed.

Although the trial court erred by imposing a sanction for KCS' alleged discovery violation, the sanction imposed did not prejudice KCS. The court permitted the videotapes to be shown to the jury. The jury, thus, heard and saw relevant evidence relating to the extent of Giddens' physical injuries.

■■■ KCS appears to suggest that the deposition testimony should have been admitted simply to impeach the general credibility of Giddens. It was not prevented, however, from impeaching Giddens with respect to any specific testimony by use of

the videotape or with his prior testimony from the first or second trial or first or second deposition. The use of the other materials was sufficient to ensure that the jury had the information necessary to evaluate the testimony properly. The trial court's sanction, although erroneous, did not prejudice KCS.

KCS next asserts that the trial court erred in permitting Giddens' counsel to read and display to the jury certain regulations promulgated under the Occupational Safety and Health Act, 29 U.S.C. sections 651, et seq. (OSHA). The OSHA regulations at issue concerned the type of chains used on the locomotive crane that lifted the railroad track and the OSHA requirements that such chains be tested, inspected, and labeled for their appropriate use. John Edwin Blaylock, a division engineer, and Larry Dobson, KCS' company representative, testified to KCS' compliance with OSHA regulations. Both witnesses testified that they were not familiar with the OSHA regulations. During closing argument, Giddens' counsel referred to the OSHA regulations, argued KCS' duty to know applicable OSHA regulations, and to follow them, and argued KCS' conduct failed to meet these OSHA regulations when it failed properly to test, inspect and tag the chains.

OSHA regulations offered as evidence of the standard of care owed by a party are competent evidence relevant to the question of negligence. *See Schneider v. Union Elec. Co.*, 805 S.W.2d 222, 229 (Mo.App.1991). Moreover, such rules and regulations promulgated pursuant to federal statutes may be judicially noticed and considered as evidence. *See Kawin v. Chrysler Corp.*, 636 S.W.2d 40, 44 (Mo. banc 1982). A trial court may permit pertinent rules of this type to be read into evidence and a violation of the substance of pertinent rules may be hypothesized as evidence supporting a jury finding of negligence. *Id.; Hough v. Rapidair, Inc.*, 298 S.W.2d 378, 383 (Mo. banc 1957).

KCS argues that the OSHA regulations Giddens introduced into evidence were not in effect at the time of the accident in 1989; the regulations from the 1984 volume of the Code of Federal Regulations were offered at trial. KCS does not dispute, in its reply brief, Giddens' contention that the relevant regulations remained the same from 1979 to 1993. Giddens presented sufficient evidence of the relevance and applicability of the OSHA regulations at issue to allow their admission.

Finally, while KCS argues that Giddens used the OSHA regulations as a basis for arguing negligence *per se*, the OSHA regulations were used only to support the argument that KCS breached a standard of care it owed to its employees by violating the regulations. For this purpose, the regulations were competent evidence that could be considered by the jury, along with other evidence bearing upon the question of KCS' negligence. *See, e.g., Schneider*, 805 S.W.2d at 229. Negligence *per se* was neither argued nor submitted. Therefore, it was not error for the trial court to admit evidence of the OSHA regulations and their alleged violation by KCS.

As it was not error to admit the OSHA regulations, KCS' argument that the trial court erred in failing to give the jury an instruction withdrawing from its consideration evidence of the regulations and of KCS' alleged violation of them is rejected.

KCS asserts the trial court erred in failing to find that the amount of the jury verdict was against the weight of the evidence in that: (1) the $1,520,000 award was so grossly excessive as to indicate bias, passion and prejudice on the part of the jury; (2) there was insufficient evidence to support the amount of the award; and (3) the amount of the award was so large as to show that the jury failed to follow the court's instruction that Giddens had a duty to mitigate damages.

The standard of review of a claim that the trial court erred in failing to

find the verdict excessive is a narrow one: an appellant must show both that the verdict is excessive and that some event occurred at trial that incited the bias and prejudice of the jury. The mere size of the verdict does not in and of itself establish that it was the result of bias or passion and prejudice without showing some other error was committed during the trial. *Means v. Sears, Roebuck & Co.*, 550 S.W.2d 780, 788 (Mo. banc 1977). KCS has failed to meet this standard, for it has failed to identify any trial event that could have caused the bias and prejudice it claims occurred. The errors specifically alleged have not been found to be meritorious; therefore, they cannot serve as a predicate for a finding of excessiveness of the verdict.

KCS also fails to meet the second prong of the excessiveness test by showing that the size of the verdict is so grossly excessive as to shock the conscience because it is glaringly unwarranted. In reviewing verdicts to determine if they are excessive, appellate courts overturn only those verdicts that are obviously out of line and grossly improper. To obtain relief on the basis of excessive verdict, the defendants must demonstrate that the verdict is glaringly unwarranted so as to shock the conscience of the court. *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 21 (Mo. banc 1994). The test applied by appellate courts is not fine-tuned and should not be; the appellate courts generally defer to the jury's decision as to the amount of damages. This is as it should be because the determination of the amount of damages is a task that lay juries are particularly able to perform. *Id.*

Here, as a result of the accident, Giddens sustained permanent injury to his left hand, limiting the dexterity and overall strength in his left arm. The injury was sufficiently severe that he was unable to work for one year after the injury and required repeated surgeries and consequent additional months off work while he recovered. A disability evaluation rated Giddens at a 30% disability of the left upper extremity and an 18% disability of the body as a whole. At the time of trial, Giddens was 44 years old with a high school education. Giddens' entire work history consisted of heavy labor for the railroad. He was ultimately let go by the railroad because he was unable to continue employment in this line of work due to his injury. A rehabilitation specialist testified that Giddens' future employment opportunities would be limited to areas of light and sedentary work requiring minimal use of the left hand. The specialist offered the opinion that, even were Giddens able to find employment of this nature, it most likely would be an unskilled, minimum wage job and that, because of Giddens' injury, it was reasonable to expect he would suffer periods of unemployment. A professor of economics testified that the present value of Giddens' total lost earnings ranged from a high of $1,017,019, to a low of $541,836, depending on when Giddens would have retired and whether he would be able to find minimum wage employment.

While the jury award of $1,520,000 based on this evidence was generous, particularly if the jury found Giddens to be contributorily at fault to a substantial degree, it was not so grossly excessive, in light of the amount of his past and potential future lost wages and in light of his injuries, pain and suffering, that it shocks the conscience of the Court or causes this Court to believe that the jury award was based on passion and prejudice rather than on the evidence.

In its next point, KCS objects to the manner in which the trial court directed the jury to record its damage determinations.

■ In most Missouri cases the jury is asked to determine a total amount of damages and the percentage of fault of plaintiff and of defendant, and the jury is told that the judge will reduce the total damages awarded by the percentage of fault attributed to plaintiff. *See, e.g., MAI 37.03.*

FELA, however, requires the jury rather than the judge to diminish the total damages by the comparative fault of the plaintiff. *45 U.S.C. sec. 53.* For this reason, the jury in FELA cases is instructed that after it determines the sum of damages to which it believes plaintiff is entitled as a result of the defendant's conduct, "If you find plaintiff contributorily negligent as submitted in Instruction Number _____, then your award must be determined by diminishing plaintiff's total damages in proportion to the amount of negligence attributable to plaintiff." *MAI 8.02.* The Committee Comment to MAI 8.02 explains this variance:

> The submission of comparative fault in an F.E.L.A. case differs from the method in Chapter 37.00 for use in cases based on Missouri law. F.E.L.A. cases are governed by federal law. Under 45 U.S.C. Sec. 53, the *jury* diminishes damages in proportion to the employee's negligence. Under Chapter 37.00, the jury determines *total damages* and plaintiff's percentage of fault but the *judge* makes the actual computation diminishing total damages to the amount recoverable by plaintiff.

MAI 8.02, Committee Comment (1996 Revision).

KCS objected to instructing the jury in accordance with MAI 8.02 on the basis that this instruction "unconstitutionally discriminates against railroads by instructing in FELA cases differently than in other similar comparative fault cases." KCS never elaborated on this objection by explaining for the trial court how or why this alleged discrimination was unconstitutional, and the trial court overruled the objection. In this Court, KCS now argues that the instruction and verdict form are unconstitutional in that they treat railroads differently from other negligent defendants and that this violates the Missouri and United States constitutions' due process, equal protection and· supremacy clauses.

KCS has failed to preserve its claim that the manner of submitting FELA cases violates the Missouri constitution. It nowhere cites to provisions of the Missouri constitution that are allegedly violated (Missouri, of course, has no supremacy clause), nor does it argue how they are violated. It limits the argument portion of its brief to a discussion of the alleged violation of federal law and the federal constitution. We accordingly do not further address its claims of violation of the Missouri Constitution. *Beatty v. State Tax Comm'n,* 912 S.W.2d 492, 498–99 (Mo. banc 1995).

▮▮▮ KCS does allege in its argument in this Court that due process is violated because the parties and the appellate courts have no means of determining whether the jury correctly made its mathematical computations in diminishing total damages by the amount of plaintiff's negligence or whether it properly reduced total damages by plaintiff's fault in the first instance. It urges that this denies meaningful judicial review. This is not the same argument that KCS made to the trial court below. There, it argued not that the instruction was vague or ambiguous, or denied the parties meaningful appellate review, but rather that the instruction unconstitutionally discriminated between FELA and non-FELA cases. Where an alleged error on appeal relating to an instruction differs from the objections made to the trial court, the error may not be reviewed on appeal. *Seidel v. Gordon A. Gundaker Real Estate Co., Inc.,* 904 S.W.2d 357, 364 (Mo.App.1995); *see State v. Hankins,* 642 S.W.2d 606, 611 (Mo. 1982). This portion of KCS' argument also is not preserved.

▮▮▮ The bulk of KCS' argument in this Court on the issue of submission of damages asserts that the distinction between how the jury records its damage verdict in FELA and non-FELA cases constitutes unconstitutional "discrimination" against FELA cases. It never explains in the argument portions of its brief how this alleged discrimination rises to a constitu-

tional level, or what constitutional provisions are violated or how the violation occurs. In its point relied on, KCS suggests a violation of the equal protection clause, but it never refers to that clause in its argument nor does it cite any cases supporting an equal protection claim. That argument is deemed abandoned.

While KCS also fails to refer to the supremacy clause directly in the argument section of its brief, it does support its discrimination argument by citing to a number of federal cases that have struck down state laws discriminating against the bringing of FELA actions. *See, e.g., New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); *Dice v. Akron, Canton & Youngstown R.R. Co.*, 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952); *Mondou v. New York & New Haven R.R. Co.*, 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327 (1912). It notes these cases do not allow a state to "discriminate disadvantageously against actions for negligence under the Federal Act as compared with local causes of action in negligence." While most of these cases do not address the supremacy clause issue, *Mondou* and *McKnett v. St. Louis & S.F. Ry. Co.*, 292 U.S. 230, 54 S.Ct. 690, 78 L.Ed. 1227 (1934), cite that clause as a basis for striking down application of state law in FELA cases regarding jurisdictional issues. *Mondou*, 223 U.S. at 57–59, 32 S.Ct. 169.

Here, however, KCS has not identified any way in which Missouri is discriminating disadvantageously against actions for negligence under FELA. It is simply objecting to how Missouri allows the jury to record its damage verdict in such cases, not to law governing the standards under which such damages may be awarded or the amount of damages that may be awarded. KCS cites no authority for the proposition that it is disadvantageous to FELA actions if jury instructions are not identical in FELA and non-FELA cases, and none is found. Moreover, none of these cases addresses the issue now raised by KCS, that it is unconstitutional to require a jury to break out its damages and comparative fault determination separately in non-FELA cases but not in FELA cases. Accordingly, KCS' constitutional arguments are rejected.

 In its last point on appeal, KCS asserts the trial court erred in refusing to admit evidence of Giddens' Railroad Retirement Disability Benefits. As a general rule, evidence of a plaintiff's receipt of disability pension payments under the Railroad Retirement Act is inadmissible at trial under the "collateral source doctrine" because its probative value is outweighed by its potential prejudicial effect on the jury. *Eichel v. New York Cent. R.R. Co.*, 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963). Numerous rationales have been used to justify the application of the collateral source rule. *See Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 619 (Mo. banc 1995). KCS argues, however, that the rationale behind exclusion of collateral source payments does not apply to Giddens' pension benefits, since they are funded, at least in part, by the railroads themselves. *Eichel* forecloses this argument.

 Nevertheless, KCS argues that an exception to the collateral source rule has been recognized where the plaintiff injects his financial condition into a case. *Moore v. Missouri Pacific R. Co.*, 825 S.W.2d 839, 842–43 (Mo. banc 1992). KCS is precluded from raising this issue by the law of the case doctrine. The general rule is that the decision of a court is the law of the case for all points presented and decided, as well as for matters that arose prior to the first adjudication and might have been raised but were not. The court's decision remains the law of the case throughout all subsequent proceedings, both in the trial and appellate courts. *Shahan v. Shahan*, 988 S.W.2d 529, 533 (Mo. banc 1999). This doctrine applies in this case because the issue of whether the testimony of the rehabilitation specialist as to Giddens' motivation to work opened the door for introduction of evidence of Gid-

dens' pension benefits was determined unfavorably to KCS in the first appeal of this case. *Giddens v. Kansas City Southern Ry. Co.*, 937 S.W.2d 300, 305 (Mo.App. 1996). KCS is not free to re-litigate this issue now.

The judgment of the trial court is affirmed.

LIMBAUGH and COVINGTON, JJ., concur; WOLFF, J., concurs in separate opinion filed; WHITE and BENTON, JJ., concur in opinion of WOLFF, J.

PRICE, C.J., and HOLSTEIN, J., not participating.

MICHAEL A. WOLFF, Judge, concurring.

The trial judge was correct in determining that the railroad and its attorneys violated the duty seasonably to supplement, under our Rule 56.01(e), as to the existence of surveillance videotapes of plaintiff Gidden. We should interpret the word "seasonably" to refer to the time standard for interrogatories. Applying the time standard for interrogatories to this case, the railroad had an obligation to correct its answer to the interrogatory within 30 days after it learned that it had videotapes of Giddens.

"We have come a long way since the days of the 'sporting theory of justice.' " *State ex rel. State v. Riley* 992 S.W.2d 195, 197 (Mo. banc 1999). Pre-trial discovery performs important and legitimate functions. Liberal discovery aids in overall trial preparation, narrowing of issues, promotion of early settlements, and most importantly, the ascertainment of truth. Our rules should be interpreted to promote the search for truth and evenhandedly minimize game playing by lawyers on both sides of counsel table.

The supplementation rule promotes the search for truth. It eliminates the need for periodic waves of repetitive interrogatories. Prior to the 1970 version of Federal Rule 26, upon which our Rule 56.01 is based, federal decisions recognized that a court, in ordering a party to answer an interrogatory, could expressly provide that the interrogated party was under a continuing duty to supplement in light of new information. Some courts held that the discovering party itself could make the interrogatories continuing by so providing in its interrogatories, while other courts refused to allow this. *See* 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE sec. 2048 (2d ed.1994).

Rule 56.01(e) requires a party "seasonably" to supplement its interrogatory answers as to the identity of witnesses, including experts, or when the party learns that an interrogatory response was incorrect when made or is no longer true. If we were to deem these interrogatories as continuing, then the duty "seasonably" to supplement would logically incorporate the time limit in our Rule 57 .01(a), which in this instance would be 30 days after the date that "the party obtains information upon the basis of which the party knows that the response (A) was incorrect when made or (B) though correct when made is no longer true." Rule 56.01(e)(2).

There is no reason the time limit for supplementing an interrogatory answer should be different from the time limit for answering an interrogatory in the first place.

The use of the word "seasonably" in the rule, rather than specific reference to time limits, recognizes the flexibility needed when a trial date is imminent, which was not the case here. The court of appeals in *State ex rel. Missouri Highway and Transportation Commission v. Pully*, 737 S.W.2d 241, 244–45 (Mo.App.1987), reads the word "seasonable" to mean "reasonable." In cases where trial is imminent, use of a 30–day time limit would be unreasonable. This interpretation would track the flexibility given in Rule 57.01(a) for the court to allow a shorter or longer time than 30 days for the answering of interrogatories. The presumption in all cases

should be that the 30–day time limit for interrogatories applies to the duty to supplement. The presumption is overcome where circumstances, such as the timing of the trial setting or pretrial discovery order, warrant a shorter or longer time. No such circumstances appear in this case.

If a party with a surveillance videotape wishes to withhold that evidence from discovery until the plaintiff has been deposed, the party—in this case the railroad—should seek a protective order under Rule 56.01(c) or an order under Rule 56.01(d) as to the sequence and timing of discovery. To fail to disclose even the existence of such materials, which have properly been requested, does not further the search for truth and violates our discovery rules.

Federal courts sometimes permit a delay in production of a plaintiff's statements by issuing a protective order allowing the defendant to delay disclosure of statements until after the plaintiff's deposition has occurred. *See Torres–Paulett v. Tradition Mariner, Inc.*, 157 F.R.D. 487, 489 (S.D.Cal.1994); *Smith v. Central Linen Service Co.*, 39 F.R.D. 15, 18 (D.Md.1966). Where no protective order has been re-

quested, federal courts have held that the statement must be produced. *See, e.g., Willard v. Constellation Fishing Corp.*, 136 F.R.D. 28 (D.Mass.1991). The same protective order provisions are available under our Rule 56.01(c).

With due respect to the federal precedents, a motion for protective order does not precisely fit this situation, because the grounds for such an order are "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."[1] The more appropriate motion, it seems to me, is a motion under Rule 56.01(d)[2] which allows the court, "in the interest of justice," to set the sequence of discovery.[3] Thus, under this provision, a court could order that the videotapes be withheld until the plaintiff's deposition has been taken. Rule 56.01(c) requires a party to show "good cause" to obtain a protective order, and Rule 56.01(d) recites "as justice requires." The federal trial court cases cited above suggest that a defendant would be entitled to a protective order by simply asserting that the defendant wants the benefit of an unrefreshed recollection of the facts. Other trial judges, however,

---

1. Rule 56.01(c) provides:

(c) Protective Orders. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(1) that the discovery not be had;

(2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place;

(3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;

(4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters;

(5) that discovery be conducted with no one present except persons designated by the court;

(6) that a deposition after being sealed be opened only by order of the court;

(7) that a trade secret or other confidential research, development, or commercial infor-

mation not be disclosed or be disclosed only in a designated way;

(8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

If a motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery. The provisions of Rule 61.01 apply to the award of expenses incurred in relation to the motion.

(Rule 56.01(c) is similar to federal Rule 26(c).)

2. (d) Sequence and Timing of Discovery. Unless the court upon motion, for the convenience of parties and witnesses and in the interests of justice, orders otherwise, methods of discovery may be used in any sequence and the fact that a party is conducting discovery, whether by deposition or otherwise, shall not operate to delay any party's discovery.

3. Our Rule 56.01(d) is similar to federal Rule 26(d).

might require a party to show, by reference to pleadings and discovery, the possibility that a plaintiff's claims may be overblown.

Requiring a party possessing statements or surveillance video to move for an order will prevent knowing concealment of discoverable materials that have been properly requested. When a party is required to seek an order to withhold disclosure of such material temporarily, the defendant may still have the benefit of getting the plaintiff's version of the facts on the record before producing a statement that might affect plaintiff's testimony. An order should also ensure that the plaintiff will have the statement in time to prepare for trial.

This interpretation would have the salutary effect of ensuring that the deponent is careful not to exaggerate, because the deponent cannot be sure what written or videotaped statement may be produced in discovery after the deposition. *See* 23 Am. Jur. 2d *Deposition and Discovery* sec. 46 (1983).

In this case, when plaintiff's counsel was served with a notice that his client was to be deposed again, the railroad should have moved for an order allowing it not to disclose the videotaped surveillance until after the deposition was taken. If such a motion is not required, the option is for plaintiff's counsel to file a specific request for supplementation of the previous interrogatories, or a repetitive set of interrogatories, and then go to the court to have the time shortened for the responses so that the attorney can get answers before the client's deposition. While our Rule 56.01(e)(3) allows for such repetitive requests, we should not clutter up the discovery process by encouraging their use.

When we interpret the word "seasonably" as presumptively incorporating the time limits of the interrogatory rules, we have a more precise standard for determining when the supplementation rule is violated. In this case, the railroad was required to disclose the videotapes no later than June 15, and July 3, 1997, which were 30 days following the respective dates on which the railroad's attorney received the two videotapes. However, the videotapes were not disclosed until July 8, 1997, after the plaintiff's deposition was concluded. Under this standard, the trial court did not abuse its discretion in imposing a sanction on the railroad for failing seasonably to supplement its answers.[4]

If we uphold the trial judge's conclusion that the railroad violated its duty "seasonably" to supplement its interrogatory answers, then the trial judge's sanction—prohibiting use of the deposition at trial—makes sense. The resolution by the trial judge furthered the trial as a search for truth. The trial judge appropriately allowed the railroad to use the surveillance videos to minimize the plaintiff's injuries. What the trial judge prohibited was the use of the alleged "gotcha" deposition; at most the deposition may have shown that Giddens had previously exaggerated his injuries or the extent of his disability. Juries of course do penalize plaintiffs, sometimes in the measure of damages, if they believe a plaintiff has exaggerated, lied, or is a malingerer. What the railroad was deprived of, in this instance, was perhaps the opportunity for some jury justice that would not have been legally relevant to the real issues in the case, i.e., whether the railroad was negligent and what were the nature and extent of the plaintiff's injuries.

I would uphold the trial judge's resolution of this issue. I concur in the result reached by the principal opinion, and in the analyses of the other issues in the principal opinion.

---

4. The deposition was held on July 3, 1997. It is possible that the second videotape would not have been seasonably produced, under this standard. But certainly the first videotape, from May 15, 1997, would have been disclosed, or an appropriate order sought.