

# In the Missouri Court of Appeals
# Eastern District

### DIVISION ONE

| | | |
|---|---|---|
| DANIELLE MCGAUGHY, | ) | No. ED107498 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Steven R. Ohmer |
| LACLEDE GAS COMPANY, et al., | ) | |
| | ) | |
| Appellants. | ) | FILED:  April 14, 2020 |

Laclede Gas Co. ("Appellant") appeals from the judgment of the Circuit Court of the City of St. Louis, following a jury trial, awarding Danielle McGaughy ("Respondent") $1.3 million in actual damages and $7.2 million in punitive damages on her claims for race discrimination and retaliation.  We affirm.  We also remand to the trial court to determine the appropriate attorneys' fees award.

### I.  Background

Based on our applicable standard of review, we review the evidene "in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict."  Giddens v. Kansas City S. Ry. Co., 29 S.W.3d 813, 818 (Mo. banc 2000).

Respondent is an African-American woman born and raised in St. Joseph, Missouri. After finishing high school in 1989, she alternated between going to college and working before

eventually graduating from what is now Missouri Western State University with a paralegal certificate and two-year associate degree in legal studies, in 1996.

After graduating, Respondent began a career in the legal field. First, she went to work for the Jackson County Prosecutor's Office, working in the anti-drug "COMBAT" unit. In this position she performed administrative duties, drafted interrogatories, served search warrants, performed searches in the field, and prepared documents for discovery. After five years with the prosecutor's office, Respondent went to work as a legal assistant for the Jackson County Family Court. In that position she obtained information from confidential informants, prepared documents for discovery, performed legal research and writing, prepared witnesses for testimony, and issued subpoenas for hospital records. Next, an attorney Respondent knew at the Kansas City Public School District ("KCPSD") recruited her to work there. In that role she conducted on-site investigations, investigated complaints about teachers, spoke with witnesses, wrote reports, and debriefed her attorney supervisor. Respondent later went to work with a trademark firm in Atlanta, Georgia, handling discovery matters, before returning to Missouri to work as a municipal court clerk, where she managed pretrial and traffic dockets.

In 2004 Respondent went to work for Missouri Gas Energy ("MGE"), which was later acquired by Appellant. Respondent testified at trial that she took that position because she felt this was "a company that I would retire at." Initially she worked in the legal department at the Kansas City office as a legal assistant. In 2006 she became a full-time gas supply specialist, participating in Sarbanes-Oxley audits, monitoring federal gas tariffs, storage contracts, gas pipeline and supplier contracts, and performing administrative duties. However, the long commute between St. Joseph and Kansas City took away from the time Respondent could spend with her son, whom she raised as a single-mother. Thus, in 2008 she transferred to the St. Joseph office and became an engineering technician.

Once Respondent started working in the St. Joseph office, she immediately began experiencing what she would eventually describe as the "toxic" work environment in that office. She was the only African-American in the St. Joseph office. Her first day in the office, she heard two Caucasian co-workers discussing how "blacks don't take pride in their work, where they live, or anything." The woman who was supposed to train her, Diane Munsell ("Munsell"), provided only minimal training. Respondent testified that when she was out of the office, Munsell would go through her desk, making it "her mission . . . to find something to go tell and complain about." When Respondent's co-worker Steve Gard ("Gard"), a Caucasian man, confronted Munsell about why she was not adequately training Respondent, Munsell replied, "I don't want my job taken by a n****r."

Things only got worse for Respondent when Robert Hart ("Hart"), became her supervisor roughly two years after she transferred to St. Joseph. Hart reported to Gary Williams ("Williams"), who presided over both the Kansas City and St. Joseph offices. Respondent called multiple witnesses at trial who testified, over Appellant's objection, to hearing Hart repeatedly use the word "n*****r," and using the terms "n****r-rigged" and "jigaboo." In addition to Hart, fellow employees Barb Labass ("Labass") and Bill Martin ("Martin") contributed to the toxic environment. Respondent testified that Labass, whose office was next door to hers, prominently displayed Paula Deen magazines on her desk after the scandal leaked that Deen had used the word "n****r" in reference to an African-American employee. The magazines were not there before the scandal broke. Additionally, Respondent once found an email Labass was photocopying and circulating in the office. She testified that the email said "that the blacks and Mexicans were taking over," and that "Obama was going to bankrupt and close all the banks . . . ."

Bill Martin ("Martin") was also a central figure in the racially charged environment in the St. Joseph office. Martin would mockingly sing in the office, "Free at last, free at last, thank God Almighty, we're free at last like these m****r f*****s are." One of Respondent's witnesses at trial also testified that he heard Martin use the n-word "too many times to count."

Eventually, Respondent had enough. In 2013 she filed a human resources complaint about racial discrimination in the St. Joseph office with Clarence Moran ("Moran"), a Human Resources officer. Her HR complaint pointed to, *inter alia*, Hart and Martin's conduct in the office. Respondent met with Williams, Moran, and Hart the following Monday. Instead of addressing Respondent's complaint, Williams accused her of having an intimate relationship with Gard, a Caucasian co-worker. Moran followed Williams by telling Respondent that she needed to look at herself and see why people treated her the way they did. The panel then alleged that Respondent was not helpful to her co-workers, and that a number of them were complaining about her. Respondent noted that her recent performance review had not mentioned anything about co-workers complaining about her.

After that meeting, Respondent called the company's HR hotline and filed a complaint with the third-party Appellant used to administer HR complaints. On April 17, 2013, Respondent drafted a formal memo outlining her complaint in further detail, and sent the Memo to Williams, Moran, Hart, and HR Vice President, Deborah Hayes (HR VP). Williams then called her, said "you got their f*****g attention" and hung up the phone. The third-party investigator who spoke with Respondent confirmed there was no evidence of her co-workers complaining about her performance, but the investigation eventually concluded that there was no discrimination. Hart was eventually transferred to Kansas City, where he remained in a management role, and continued the conduct about which Respondent complained. He was also allowed to keep his company car. Before his transfer, Hart told Williams that Respondent did

4

not have enough work to keep her busy, so Respondent was given an additional workload without an increase in pay.

The toxic environment in the St. Joseph office continued after Respondent's HR complaint, despite the company ordering a diversity training. In February 2014, Martin barged into Respondent's office, joined by two other men, and began shouting at Respondent. Martin yelled "[y]ou don't know a f*****g thing and you don't do a f*****g thing. You're a nothing and a nobody." Martin also warned Respondent that she needed to "f*****g leave me off your radar." Respondent complained to Moran, but again, nothing was done.

*The Claims Supervisor Position*

Around the time of the incident with Martin, Appellant posted an opening for a claims supervisor position. By that time Respondent had a bachelor's degree in legal studies and was pursuing a master's degree. Because she had prior experience in the legal field, and this position would provide a substantial raise, Respondent applied for the position. Respondent was eventually interviewed by a panel consisting of Nicole Fondren ("Fondren"), an African-American HR employee, Mike Smith ("Smith") one of Appellant's in-house lawyers, and Joe Gallagher ("Gallagher"), the Claims Manager. When Respondent emerged from this interview as the top candidate, Gallagher decided he wanted to interview more people. Smith then approached Laura Garcia ("Garcia"), who is Caucasian and worked for Williams, to apply despite the fact that she had not applied for the position. A new round of interviews was held, except this time Fondren, the lone African-American on the original panel, was replaced by Cindy Dove ("Dove"), a Caucasian woman who performed HR investigations for Appellant in Kansas City. Garcia was hired for the position.

5

*Transfer to Kansas City*

In May 2014, with roughly one week's notice, Williams ordered Respondent to begin commuting the 63 miles to the Kansas City office three days a week. Respondent was disappointed, because she had transferred from the Kansas City office to St. Joseph due to the long commute, and the fact it took away time with her son. Williams testified at trial that she was transferred to assist with the increased workload brought on by Appellant's acquisition of MGE. Despite the allegedly increased workload and a budget increase of millions of dollars, Respondent was the only employee transferred. Respondent testified that she had never seen another employee transferred for non-disciplinary reasons. Additionally, her office in St. Joseph was confiscated, and she was forced to work in a cubicle for the two days per week that she remained working there. All of the other office staff worked from private offices.

On February 11, 2016, Respondent filed this suit in the Circuit Court of the City of St. Louis, alleging race discrimination and retaliation. Following a two-week trial, the jury unanimously returned a verdict in Respondent's favor, awarding her $1.3 million in actual damages and $7.2 million in punitive damages. The trial court entered judgment on September 6, 2018. On October 5, 2018, Appellant filed a motion for a new trial and for judgment notwithstanding the verdict, as well as a motion to amend the judgment to enforce the damage cap imposed by the 2017 amendments to the Missouri Human Rights Act ("MHRA"). The circuit court denied those motions on January 4, 2019, and Appellant filed a notice of appeal on January 8, 2019.

## II. Discussion

Appellant raises six points on appeal. First, Appellant argues the trial court erred in denying its motion to amend the judgment to enforce the damage cap because the court was obliged to follow the law as it existed on the date of judgment, in that Respondent had no vested

6

right to punitive damages until judgment was entered. For large companies like itself, Appellant argues the 2017 amendments to the MHRA cap all damages, other than back pay and interest thereon, at $500 thousand. Appellant reasons that while Respondent's actual damages were much more than $1 million, no one has a vested right to punitive damages until the entry of judgment, and thus the trial court should have applied the law in effect at the time of judgment and eliminated the punitive damages award.

Second, Appellant argues the trial court erred in allowing Respondent's "me too" evidence in support of her hostile work environment claim, because such evidence was irrelevant. Appellant reasons that because none of the "allegedly hostile remarks" were directed to, nor heard by, Respondent, the evidence from other current and former employees regarding their own experiences was irrelevant, and its prejudicial effect far outweighed any probative value.

Third, Appellant argues the trial court erred in denying its motion for a directed verdict on Respondent's claim for race discrimination for several reasons. Appellant first reasons that Respondent did not have a submissible case of discriminatory failure to promote, in that there was no substantial evidence her race played any role in that decision. Next, Appellant reasons that Respondent did not have a submissible case of a hostile work environment because the evidence specific to her was isolated and incidental, rather than severe or pervasive. Appellant also reasons that if the Court grants any relief on the merits, Appellant is entitled to a new trial on all issues.

Fourth, Appellant argues the trial court erred in denying its motion for a directed verdict on Respondent's retaliation claim. Appellant argues Respondent did not have a submissible case of retaliation on her failure to promote claim because there was no substantial evidence that her complaint played a causal role in the decision not to promote her. Appellant also reasons that

7

Respondent did not have a submissible case of retaliation on her other retaliation claims because there was no substantial evidence that her complaint played a causal role in those decisions. As Appellant argues in point three, it also argues in point four that any relief on the merits entitles Appellant to a new trial on all issues.

Fifth, Appellant argues the trial court erred in giving jury instruction No. 6 ("Instruction 6") because it did not submit all of the elements of a hostile work environment, in that it did not require a finding that the alleged harassment was so severe or pervasive that it affected a term, condition, or privilege of her employment, or that Appellant knew or should have known of it.

Sixth and finally, Appellant argues the trial court erred in awarding Respondent attorneys' fees. Appellant reasons that the award was premature, because an outright reversal would require denial of any attorneys' fees, and a reversal on any ground other than the damage cap would require a new trial.

### Points I, III, IV, & V

Because Appellant's first, third, fourth, and fifth points are all analyzed under the *de novo* standard of review, we will analyze them separately from Appellant's second and sixth points.

A. Standard of Review

Issues of statutory interpretation, whether there was sufficient evidence to submit an issue to the jury, and the propriety of instructions given to the jury are all questions of law that this Court reviews *de novo*. Hervey v. Mo. Dept. of Corrections, 379 S.W.3d 156, 163 (Mo. banc 2012); Vintila v. Drassen, 52 S.W.3d 28, 40 (Mo. App. S.D. 2001); Hopfer v. Neenah Foundry Co., 477 S.W.3d 116, 124 (Mo. App. E.D. 2015). Appellate review of the sufficiency of the evidence to support the giving of an instruction is made "in the light most favorable to its submission," and if the instruction is supportable by any theory, its submission is proper. Vintila, 52 S.W.3d at 28; see also Hopfer, 477 S.W.3d at 124.

B.  Analysis

**Point I: The Trial Court did not Err in Refusing to Cap the Punitive Damages Award**

In its first point on appeal, Appellant argues the trial court erred in denying its motion to amend the judgment to enforce the damage cap because the court was obliged to follow the law as it existed on the date of judgment, in that Respondent had no vested right to punitive damages until the judgment was entered.  We disagree.

The primary rule of statutory interpretation is to "ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider the words in their plain and ordinary meaning."  Hervey, 379 S.W.3d at 163.  Where the language of a statute is "unambiguous and clear," this Court will give effect to the language as written, and will not engage in statutory interpretation.  Dubinsky v. St. Louis Blues Hockey Club, 229 S.W.3d 126, 130 (Mo. App. E.D. 2007).  Effective August 2017, the Missouri Legislature Amended Section 213.111, RSMo,[1] to provide for a cap on punitive and actual damages via Senate Bill 43 ("S.B. 43").  The amended statute states, in pertinent part:

> 4.  The sum of the amount of **actual damages . . . and punitive damages** awarded under this section shall not exceed for each complaining party:
>
> (1) Actual back pay and interest on back pay; and
>
> . . .
>
> (2)(d)  In the case of a respondent who has **more than five hundred employees** in each of twenty or more calendar weeks in the current or preceding calendar year, **five hundred thousand dollars**.

Section 213.111.4 (emphasis added).  The prior version of Section 213.111 contained no such cap.

---

[1] Unless otherwise indicated, all statutory references are to the Revised Statutes of Missouri in effect in February 2016, when Respondent filed this case.

The Western District of this Court recently decided this same issue in <u>Dixson v. Missouri Dep't Corr.</u>, and we find that case dispositive of Appellant's first point. 586 S.W.3d 816 (Mo. App. W.D. 2019). In August 2016, Dixson filed a petition for damages against the Missouri Department of Corrections ("DOC"), alleging race discrimination, hostile work environment, and retaliation. <u>Id.</u> at 822. A jury trial was held in December 2017, where several of Dixson's co-workers corroborated Dixson's account of his work experiences. The jury returned a verdict in Dixson's favor on his retaliation claim, awarding him $280 thousand in actual damages and $1.2 million in punitive damages. <u>Id.</u> On appeal, the DOC argued that the court erred in failing to apply the damages cap imposed by the S.B. 43 amendments to the MHRA, in that the damages cap was "merely procedural or remedial," and could thus be applied retrospectively. <u>Id.</u> at 825.

The Western District disagreed, holding that the damages cap applied only prospectively and to retroactively apply the cap would be unconstitutional. <u>Id.</u> at 826-27. Crucial to the Western District's decision was the fact that the damages cap "has the effect of limiting the ***total damages*** that a plaintiff may recover, including compensatory damages." <u>Id.</u> at 826. The Western District also rejected the DOC's argument that the damages cap could be retroactively applied solely to the punitive damages award, reasoning that such an argument "asks this court to effectively rewrite Section 213.111.4, to create a separate cap on punitive damages, where none was enacted by the legislature." <u>Id.</u> Further, the court likened the DOC's argument to "an argument that we should sever a portion of Section 213.111.4 that cannot constitutionally be applied retroactively . . . from the limitation on punitive damages," and found that doing so would be "rewriting a statute to do something different than what the legislature intended." <u>Id.</u> Interestingly, Appellant joined in the DOC's argument, as *amicus curiae*, and was mentioned by name in the <u>Dixson</u> court's opinion. <u>Id.</u> at 825. Appellant's argument fails for many of the same reasons as the DOC's argument in Dixson.

10

First, Appellant's argument fails because, like in <u>Dixson</u>, applying the damages cap in this case would violate the prohibition against retrospective laws. The Missouri Constitution states, "no . . . law . . . retrospective in its operation . . . can be enacted." Mo. Const. Art., I Section 13. Statutory amendments are presumed to operate prospectively, and the only exceptions to that rule are (1) where the legislature "clearly expresses an intent that the amendment be given retroactive application," or (2) the statute is merely procedural or remedial, rather than substantive. <u>Dixson</u>, 586 S.W.3d at 825. Respondent filed her case on February 11, 2016. The amended Section 213.111.4 took effect in August 2017, more than a year later. Section 213.111.4. Because the legislature expressed no such intent that the amendment to this statute apply retroactively, the first exception does not apply here. Further, the second exception does not apply because the statute is not merely procedural or remedial. As the <u>Dixson</u> court explained, Section 213.111.4 enacted one aggregate cap, which caps not only the actual damages, but also punitive damages. <u>Id.</u> at 826.

Appellant also argues that the trial court could have simply applied the cap to the punitive damages award, relying on <u>Vaughan v. Taft Broad. Co.</u>, and a litany of other inapposite service letter cases. 708 S.W.2d 656 (Mo. banc 1986); see also <u>Ball v. Am. Greetings Corp.</u>, 752 S.W.2d 814 (Mo. App. W.D. 1988), <u>Dippel v. Taco Bell Corp.</u>, 716 S.W.2d 342 (Mo. App. E.D. 1986). In <u>Vaughan</u>, the Missouri Supreme Court ruled that "punitive damages are remedial and a plaintiff has no vested right to such damages prior to the entry of judgment." 708 S.W.2d at 660. The <u>Vaughan</u> Court held further that "punitive damages are never allowable as a matter of right and their award lies wholly within the discretion of the trier of fact." <u>Id.</u> However, <u>Vaughan</u> is wholly inapposite because it dealt with a statute only addressing punitive damages, and only in service letter cases. <u>Id.</u> at 659. Further, Appellant's argument ignores the fact that the <u>Dixson</u> court, addressing this same issue, found this argument "akin to an argument that we

11

should sever a portion of Section 213.111.4," and refused to rewrite the statute "to do something different than what the legislature enacted." Dixson, 586 S.W.3d at 826. We also refuse to do so.

Appellant's argument also fails in light of the Missouri Supreme Court's decision in Klotz v. St. Anthony's Med. Ctr., 311. S.W.3d 752 (Mo. banc 2010). In Klotz, the Court held "the legislature cannot change the substantive law for a category of damages after a cause of action has accrued," and applying that rule, the Court held that the statute at issue, which placed a cap on non-economic damages, could not be retroactively applied to a claim accruing prior to the statute's effective date. Id. at 760. Here, the damages cap in Section 213.111.4 limits the total number of damages a plaintiff may recover, including compensatory damages. Thus, under Klotz, Section 213.111.4 must be interpreted to apply only prospectively to actions that accrued on or after its effective date of August 28, 2017. See Dixson, 586 S.W.3d at 826. Respondent filed her case more than a year before that date.

Our holding is further supported by the Missouri Supreme Court's adoption of new Missouri Approved Jury Instructions ("MAI") concerning the MHRA. In May 2018, the Supreme Court adopted new MAIs concerning the new standard to be applied when assessing MHRA claims and the new damages cap. See Bram v. AT&T Mobility Services, LLC, 564 S.W.3d 787, 795 (Mo. App. W.D. 2018). With regard to damages, the Supreme Court approved MAI 38.09, which states:

> If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any actual damages including back pay, other past [and future[ economic losses, and any past [and future] emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-economic losses as a direct result of the occurrence mentioned in the evidence.

MAI 38.09; see also Dixson, 586 S.W.3d at 827 (quoting MAI 38.09). The Court also approved a new verdict form, MAI 38.10, which requires the jury to individually list the dollar amount of

damages it awards for each category of actual damages, back pay, past economic losses not including back pay, future economic losses, and non-economic losses.  MAI 38.10; see also id.

Both MAI 38.09 and 38.10 are necessary for the jury to apply the damages cap in Section 213.111.4, "as the statute requires the court to determine the sum of the amount of all of the separate categories of actual damages plus punitive damages . . . ."  Id.  Most important to our purposes here, the Supreme Court specifically stated that these new instructions only apply to "actions accruing on or after August 28, 2017."  MAI 38.09; MAI 38.10.  Further, the Committee Comments and Notes on Use to each of these approved instructions direct practitioners to older instructions regarding damages and verdict forms "[f]or MHRA actions accruing before August 28, 2017. . . ."  MAI 38.09 Committee Comment G; MAI 38.10, Notes on Use 6.  As we have discussed at numerous points in our analysis of Appellant's first point, Respondent filed her case more than a year before the S.B. 43 amendments to Section 213.111.4 took effect.

Whereas retroactively applying the Section 213.111.4 damages cap to Respondent's damages award would be unconstitutional, Appellant's first point is denied.

**Point III:  Respondent Made a Submissible Case of Discriminatory Failure to Promote and of a Hostile Work Environment[2]**

In its third point on appeal, Appellant alleges the trial court erred in denying its motion for a directed verdict on Respondent's claim for race discrimination because (1) Respondent did not have a submissible case of failure to promote, in that there is no substantial evidence that her race played any role in that decision, and (2) Respondent did not have a submissible case of a hostile work environment, in that the evidence specific to her was isolated and incidental rather

---

[2] On October 23, 2019, Appellant filed a Motion to Strike Section III(A)(2)(a) of Respondent's Amended Brief. Appellant faults Respondent for stating, "[Respondent] directly experienced racial hostility" and then discussing the "me too" evidence she did not personally experience.  The motion was ordered taken with the case.  Appellant argues that this section of Respondent's brief created the "misleading impression" that she directly experienced all of the "me too" evidence.  Further, even where a party's compliance with Rule 84.04 is "less than stellar," this Court has the discretion to review the argument on the merits.  See Perry v. Tiersma, 148 S.W.3d 833, 835 (Mo. App. S.D. 2004).  Thus, even if Appellant is correct that this portion of Respondent's amended brief is misleading, we are not misled and review on the merits.  The motion is denied.

13

than severe and pervasive. Further, Appellant alleges that if this Court grants any relief on the merits, it is entitled to a new trial on all issues.

Respondent presented two theories of race discrimination: (1) discriminatory failure to promote her to the claims supervisor position; and (2) hostile work environment. To present a submissible case, a plaintiff must show "each and every fact essential to liability is predicated upon legal and substantial evidence." Giddens, 29 S.W.3d at 818. We view the evidence "in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." Id.

*Failure to Promote Respondent to the Claims Supervisor Position*

Because we apply the MHRA as it existed prior to the S.B. 43 amendments, Respondent needed to only show that her race was "a contributing factor" in the decision not to promote her. See Bram, 564 S.W.3d at 795. A contributing factor is a condition that "contributes a share in anything or has a part in producing the effect." Jones v. Galaxy 1 Mktg., Inc., 478 S.W.3d 556, 573 (Mo. App. E.D. 2015) (quoting Lomax v. DaimlerChrysler Corp., 243 S.W.3d 474, 482 (Mo. App. E.D. 2007)) (internal quotations omitted). Further, under this standard the discrimination need not be a substantial or determining factor in the employment action. Id. at 572-73.

The MHRA defines discrimination as "any unfair treatment based on race . . . as it relates to employment. . . ." Daugherty v. City of Maryland Heights, 231 S.W.3d 814, 819 (Mo. banc 2007) (quoting Section 213.010(5)). Employment discrimination cases are inherently fact based, and "often depend on inferences rather than on direct evidence . . . because employers are shrewd enough not to leave a trail of direct evidence." Cox v. Kansas City Chiefs Football Club, Inc., 473 S.W.3d 107, 116 (Mo. banc 2015); see also Daugherty, 231 S.W.3d at 818. Further,

14

rejecting the defendant's justification for an employment decision "will permit the trier of fact to infer the ultimate fact of intentional discrimination," and upon such rejection, further proof of discrimination is not required. Ferguson v. Curators of Lincoln Univ., 498 S.W.3d 481, 491 (Mo. App. W.D. 2016).

Here, the issue is whether Respondent's race played **any** part in Appellant's decision not to promote her to the claims supervisor position. At trial, and now on appeal, Appellant argued the decision to promote Garcia, instead of Respondent, was based on the fact that Garcia "had prior hands-on experience in on-site investigations in the field of natural gas."[3] Viewing the evidence in the light most favorable to the result reached by the jury, we hold that Respondent presented substantial evidence showing that her race played a role in Appellant's decision not to promote her, in that she showed Appellant's reason was merely pretextual. See Giddens, 29 S.W.3d at 818.

Respondent presented evidence at trial that particularized experience in the field of natural gas was not one of the original qualifications for the claims supervisor position. The original panel that interviewed Respondent consisted of Smith, one of Appellant's in-house attorneys in Kansas City; Gallagher, the Laclede Claims Manager; and Fondren, an HR employee. Fondren was the lone African-American on the panel. Fondren testified at trial that, prior to the interview, she held a "pre-hire meeting" with Gallagher to discuss what he was looking for in the person to fill the position. Fondren testified that she took good notes at the meeting, and her notes did not say anything about a job requirement of on-site investigation experience for the company, or that on-site investigations experience was required at all. The actual job requirements listing stated only that applicants should have "two years of experience responding to . . . incidents concerning on scene investigations." The remaining job

---

[3] Garcia testified at trial that Garcia is her married name, and she identifies as Caucasian.

15

qualifications were focused on the legal aspects of the position. The job posting also asked for a bachelor's degree, or equivalent experience.

Further, Respondent presented evidence that she met many of the requirements for this position. Prior to her employment with Appellant, Respondent worked for the Kansas City Public School District ("KCPSD"), where she conducted on-site investigations. This included investigating complaints regarding teachers, speaking with witnesses, drafting reports, and discussing the issues with those investigations with her attorney supervisor. Respondent also worked at the Jackson County Prosecutor's Office, the Jackson County Family Court, and a patent and trademark law firm before her employment with Appellant. Those positions included duties drafting discovery documents, executing search warrants, field searches, legal research and writing, preparing witnesses for testimony, and issuing subpoenas. Additionally, Respondent had a Bachelor's degree and was working towards a Master's degree.

Respondent also presented evidence showing that Garcia did not actually have much experience with on-site investigations. Smith testified at trial that Garcia had only worked in the field for less than a year, and Williams testified that she was "rarely out of the office." Gallagher testified that before hiring Garcia he had never done an on-site investigation with her, that he had not spoken with anyone who had done an on-site investigation with her, and that he had not spoken with anyone who claimed to have knowledge of her doing on-site investigations. Smith testified that the skills required for the on-site investigations could be "learned on the job." Further, Garcia did not have the amount of legal experience Respondent did, and while Respondent had a Bachelor's degree and was working towards her Master's, Garcia had a cosmetology degree. Additionally, Respondent showed that Garcia did not originally apply for the claims supervisor position, applying only after Smith asked her to do so. Smith testified that after Respondent emerged from the interviews as the top candidate, Gallagher decided he wanted

16

to interview more people.[4]  Respondent also showed that despite his policy of hiring from within, and having African-Americans working in his department over the years, Gallagher never hired an African-American in his 28 years as manager.

Finally, Respondent presented evidence that the panel that interviewed her the second time was potentially tainted.  For Respondent's second interview, Appellant replaced Fondren, the lone African-American interviewer on the first panel, with Dove, a Caucasian HR employee.  This resulted in an all-Caucasian panel.  Respondent presented evidence, via the testimony of Allen Rumbo ("Rumbo"),[5] of Dove's discriminatory animus.  Rumbo worked at Appellant's Lee's Summit location, and he testified that Dove was his contact when it came to employee issues at Appellant.  Rumbo testified that he hired two African-American employees to work in Lee's Summit, and that Dove stated on a conference call that "people are starting to talk about the type of people that you're hiring in Lee's Summit."  Further, Rumbo testified that when he later interacted with Dove about wanting to hire another African-American named W.W, Dove made a then-unsubstantiated claim that W.W had "anger issues," because "when we were interviewing him you could see that he had his fist clenched."  Dove also knew about Respondent's HR complaint, but we will address that issue in our analysis of Appellant's fourth point.  Adding Dove to the interview panel created an all-Caucasian panel with one person who likely had a discriminatory animus, and one person who had not hired an African-American in his 28 years as a manager.

Thus, Respondent presented a submissible case of a discriminatory failure to promote her to the claims supervisor position by showing (1) experience with on-site investigations in the

---

[4] At trial, Respondent's counsel and Smith had the following exchange:
   Counsel:  Okay.  So what happened was [Respondent] emerged as the top contender and [Gallagher] said to you, hey, I actually want to interview other people, correct?

   Smith:  Correct.
[5] We will discuss Appellant's issues with Rumbo's testimony, as well as the testimony of many of Respondent's other witnesses, in our analysis of Appellant's second point.

field of natural gas was not an original qualification for the claims supervisor position; (2) she met many of the qualifications for the position; (3) that Garcia was not as qualified for the position as Appellant suggested, and that Garcia only applied because Smith asked her to after Respondent emerged from the interviews as the top candidate; and (4) that replacing Fondren on the interview panel with Dove resulted in an all-Caucasian panel, comprised of Dove's likely discriminatory animus, and Gallagher, who had not hired an African-American in his 28 years as a manager. The jury could find Appellant's reason for not promoting Respondent was pretextual. See Ferguson, 498 S.W.3d at 491 (finding that rejecting the defendant's justification for an employment decision will permit the trier of fact to infer the ultimate fact of intentional discrimination, and upon such rejection, further proof of discrimination is not required); see also McGhee v. Schreiber Foods, Inc., 502 S.W.3d 658, 673 (Mo. App. W.D. 2016) ("Evidence that an employer's explanation for its decision is unworthy of credence is one factor that "may well suffice to support liability") (internal citation omitted) (internal quotation omitted). The jury heard this evidence, and disregarded Appellant's reason for not promoting Respondent. See McGhee, 502 S.W.3d at 673.

*The Hostile Work Environment*

Respondent also presented a submissible case of a hostile work environment. A successful claim of a hostile work environment requires the plaintiff to show: (1) she is a member of a group protected under the MHRA; (2) she was subjected to "unwelcome . . . harassment"; (3) the plaintiff's membership in the protected group was a contributing factor in the harassment; and (4) a term, condition, or privilege of the plaintiff's employment was affected by the harassment. Bram, 564 S.W.3d at 797. Racial discrimination creates a hostile work environment when "discriminatory conduct either creates an intimidating, hostile, or offensive work environment, or has the purpose or effect of unreasonably interfering with an individual's

18

work performance." Alhalabi v. Mo. Dept. Nat. Res., 300 S.W.3d 518, 526 (Mo. App. E.D. 2009). Further, in most claims of a hostile work environment, the discriminatory acts are "not of a nature that can be identified individually as significant events; instead, the day-to-day harassment is primarily significant . . . in its *cumulative* effect." Id. at 526 (citing Pollock v. Wetterau Food Distribution Group, 11 S.W.3d 754, 763 (Mo. App. E.D. 1999)).

Appellant only challenges Respondent's showing that a term, condition, or privilege of her employment was affected, arguing that "the balance of [Respondent's] evidence consists of generalities, offensive remarks unrelated to race, and isolated incidents involving her." Discriminatory harassment affects a term condition, or privilege of employment if it is "sufficiently severe or pervasive enough to alter the conditions of the plaintiff's employment and create an abusive working environment." Id. at 527. The harassing conduct must be severe and pervasive "as viewed subjectively by the plaintiff and as viewed objectively by a reasonable person." Fuchs v. Dept. of Revenue, 447 S.W.3d 727, 734 (Mo. App. W.D. 2014) (citing Cooper v. Albacore Holdings, Inc., 204 S.W.3d 238, 244-45 (Mo. App. E.D. 2006). A plaintiff can show that harassment affected a term, condition, or privilege of her employment by showing a tangible employment action, or an abusive working environment. Hill v. Ford Motor Co., 277 S.W.3d 659, 666 (Mo. banc 2009); Fuchs, 447 S.W.3d at 732-33. Further, in assessing the hostility of an environment, this Court has previously stated that we look to the totality of the circumstances. See Cooper, 204 S.W.3d at 245. Here, Respondent showed both a tangible employment action, and an abusive working environment.

A tangible employment action is "a significant change in employment status," and "the means by which the supervisor brings official power of the enterprise to bear on subordinates." Hill, 277 S.W.3d at 666. Some examples of tangible employment actions include "failure to promote . . . undesired reassignment . . . [and] a decision causing a significant change in . . .

19

work assignments." Id. at 667. We discussed at length above how Respondent has shown Appellant discriminatorily failed to promote her, and will discuss it further in our analysis of Appellant's fourth point, thus we will not discuss it further here. But Respondent also presented evidence that she was transferred to Kansas City, and that she was given additional work without additional pay. With one week's notice in May of 2014, Williams notified Respondent that she would be required to work in Kansas City three days a week. Respondent had moved from Kansas City to St. Joseph in order to spend more time with her son. Kansas City is more than 60 miles away from St. Joseph. Respondent testified that she was unaware of any other person who was ever transferred for non-disciplinary reasons, and Williams testified that Respondent was the only person transferred. Further, Respondent was given additional work without a pay increase, and for the two days per week that she worked in Kansas City, her office was confiscated and she was forced to work in a cubicle in the middle of the workplace. All of the other office staff had offices to work from, and prior to her transfer, Respondent had an office in which she could work. Thus, Respondent presented substantial evidence of a tangible employment action.

Respondent also presented substantial evidence of an abusive working environment. As discussed above, racial discrimination creates a hostile work environment when "discriminatory conduct either creates an intimidating, hostile, or offensive work environment, or has the purpose or effect of unreasonably interfering with an individual's work performance." Alhalabi, 300 S.W.3d at 526. Respondent presented substantial evidence that the discrimination at Appellant's St. Joseph office interfered with her job performance, testifying "I continue to look over my shoulders," and stating that the environment "makes me feel as though being African-American, I'm not worthy to work in this office because that's just not what they're used to." Respondent testified further that the environment made her "second guess my own self," and "keep myself a little guarded" at work.

20

Additionally, Respondent testified to multiple instances of racial hostility. Her very first day on the job, Respondent heard a Caucasian construction foreman and a lead survey foreman discussing how "blacks don't take pride in their work, where they live, or anything." Additionally, there was the instance where a Caucasian co-worker referred to President Obama as a "monkey." And when news broke that celebrity Chef Paula Deen used the word "n****r" to an African-American employee, Labass displayed several Paula Deen magazines on her desk. Another time Respondent went into the copy room and found an email Labass was photocopying. The email stated, "that the blacks and Mexicans were taking over and the Caucasians needed to take their money out of the banks because Obama was going to bankrupt and close all the banks and that they needed to take their money and invest it in gold bars." Appellant attempts to dismiss Respondent's evidence by arguing that these remarks were isolated and incidental, rather than severe and pervasive. However, Appellant's argument ignores the fact that in most claims of a hostile work environment, the discriminatory acts are "not of a nature that can be identified individually as significant events; instead, the day-to-day harassment is primarily significant . . . in its *cumulative* effect." Id. at 526.

It is important to note that in assessing the hostility of an environment this Court looks to the totality of the circumstances. Cooper, 204 S.W.3d at 245. Respondent testified that her supervisor, Robert Hart, would make snide comments whenever she asked a question, that he would make her feel like "the village idiot," and that she felt he was trying to degrade her in front of her co-workers, and minimize her capabilities. In 2013 Respondent made an HR complaint to Moran, an HR officer, regarding Hart's conduct and the racial environment in the office. In response, Respondent was called to a meeting with Moran, Williams, and Hart. Moran mentioned that he had discussed her concerns with Williams and Hart, and then Williams alleged that Respondent was having an intimate relationship with Gard, a Caucasian co-worker.

21

Moran then told her, "I think you need to take a look at yourself; sometimes we have to take a look at ourselves and see why people treat us the way they do," and Hart accused her of not being helpful to her co-workers.

Respondent also presented evidence that her issues were not limited to Hart, Williams, Moran, and Labass. Respondent testified Martin would come into the office and mockingly sing "negro spirituals," singing "free at last, free at last, thank God almighty we're free at last like these mother f-----s are." Respondent's 2013 HR complaint also alluded to some of Martin's conduct, leading to Martin angrily entering her office with two other Caucasian co-workers telling her to "keep me off your radar," and "[y]ou don't know a f-----g thing and you don't do a f-----g thing. You're a nothing and a nobody." Respondent would later participate in an investigation of this incident.

Additionally, Respondent called Gard to testify at trial. He testified that he heard Martin use the term "n****r" "too many times to count," and that he heard Martin refer to Respondent as a "dumb jig" one time in the office. Gard also testified he heard Martin refer to Respondent as a "dumb black bitch" on another occasion. Further, the woman who was supposed to train Respondent, Munsell, refused to adequately do so. Gard testified that when he asked Munsell why she did not want to train Respondent, Munsell told him it was because "I don't want my job taken by a n****r."

In McKinney v. City of Kansas City, another case decided by the Western District, the plaintiff sued the city for race discrimination, a hostile work environment, and retaliation. 576 S.W.3d 194, 197 (Mo. App. W.D. 2019). The plaintiff's lone explicitly racial incident was a Caucasian supervisor beginning her tenure by announcing in the presence of several African-American employees "that she was driving the bus and if the employees didn't like the way she was driving they could sit in the back or get off." Id. The court found that this evidence,

22

combined with other race neutral acts, was sufficient for the plaintiff to have a submissible claim of a hostile work environment. Id. at 200-01.

In Respondent's case, she had more than one explicitly racial piece of evidence about the environment at Appellant's St. Joseph office. Further, she also submitted the evidence of Hart demeaning her in front of her colleagues, Martin aggressively yelling at her in her office in front of two other employees, and the fact that she was accused of having an intimate relationship with a Caucasian employee when she filed an official HR complaint. Looking at the totality of the circumstances, we hold Respondent provided substantial evidence that the cumulative effect of all of these incidents created a hostile work environment. Cooper, 204 S.W.3d at 245; Alhalabi, 300 S.W.3d at 526. As discussed above, the harassing conduct must be severe and pervasive "as viewed subjectively by the plaintiff and as viewed objectively by a reasonable person." Fuchs, 447 S.W.3d at 734 (citing Cooper, 204 S.W.3d at 244-45). Respondent showed that she was personally offended. Further, once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury. Id. Here, the jury found that a reasonable person would have been offended by the conduct at issue in this case, and we will not invade that finding.

Therefore, Respondent had a submissible case of a hostile work environment in that she showed a term, condition, or privilege of her employment was affected, and that the hostility was severe and pervasive. Because Respondent made a submissible case of both discriminatory failure to promote, and a hostile work environment, point three is denied.

### Point IV: Respondent Made a Submissible Case of Retaliation

In its fourth point on appeal, Appellant alleges the trial court erred in denying its motion for a directed verdict on Respondent's retaliation claim. Appellant argues Respondent did not have a submissible case of retaliation on her retaliatory failure to promote claim, or on her other

23

retaliation claims, because she did not show that her HR complaint played a causal role in those decisions. We disagree.

As we discussed in our analysis of Appellant's third point, to present a submissible case a plaintiff must show "each and every fact essential to liability is predicated upon legal and substantial evidence." Giddens, 29 S.W.3d at 818. We view the evidence "in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." Id.

To present a prima facie case of retaliation, the plaintiff must show "(1) she complained of discrimination; (2) the employer took adverse action against her; and (3) a causal relationship existed between the complaint of discrimination and the adverse employment action." Cooper, 204 S.W.3d at 245 (citing Thompson v. W.-S. Life Assur., 82 S.W.3d 203, 207 (Mo. App. E.D. 2002). To retaliate is to "inflict in return," and retaliation includes "any act done for the purpose of reprisal that results in damage to the plaintiff . . . ." Walsh v City of Kansas, 481 S.W.3d 97, 106 (Mo. App. W.D. 2016) (citing Keeney v. Hereford Concrete Prods., Inc., 911 S.W.2d 622, 625 (Mo. banc 1995)). Further, the plaintiff must satisfy that causation standard by showing the complaint of discrimination was a "contributing factor" to Employer's adverse employment action. Templemire v. W&M Welding, Inc., 433 S.W.3d 371, 383 (Mo. banc 2014). A contributing factor is a "condition that contributes a share in anything or has a part in producing the effect." Soto v. Costco Wholesale Corp., 502 S.W.3d 38, 48 (Mo. App. W.D. 2016). If the plaintiff's protected activity was "even one contributing factor" in the employer's decision to act in reprisal, then there was an unlawful retaliation. Id.

24

*Failure to Promote Respondent to the Claims Supervisor Position*

Appellant argues there cannot be any causal connection between Respondent's 2013 HR complaint and Appellant's failure to promote her in 2014, "because no one who made that decision even knew about the complaint." However, this argument is belied by the record.

While Respondent did not present direct evidence that Appellant decided not to promote her because of her HR complaint, she presented circumstantial evidence. Because cases involving claims of retaliatory motive are inherently fact-based, usually depending on inferences rather than direct evidence, circumstantial evidence that "tends to support an inference" of retaliatory motive is sufficient. Holmes v. Kansas City Pub. Sch. Dist., 571 S.W.3d 602, 611 (Mo. App. W.D. 2018). Some examples for circumstantial evidence of causation include good work record prior to the adverse employment action, close temporal proximity between the complaint and the adverse action, atypical treatment, and facts showing the employer's explanation for the action is unworthy of credence. Soto, 502 S.W.3d at 49-50. To begin with, Respondent presented evidence in the form of her testimony that she received annual performance evaluations, and she always met or exceeded expectations. Further, we discussed in our analysis supra that Appellant's justification for not promoting Respondent—that she did not have enough experience with on-site investigations in the field of natural gas—was unworthy of credence. Thus, Respondent presented circumstantial evidence of a causal relationship between her complaint and the decision not to promote her. See id.

Additionally, Respondent presented even more circumstantial evidence that Appellant's failure to promote her was retaliatory. Gallagher testified on cross-examination that the hiring decision was made by him, Smith, Fondren, and Dove. We discussed Dove's racial biases in our analysis of Appellant's third point, supra. Further, Moran testified that he informed Dove about Respondent's complaint. Thus, someone aware of Respondent's HR complaint was in a position

to influence the decision on whether to promote Respondent to the claims supervisor position. See *Cf.* Ferguson, 498 S.W.3d at 490 (finding that bias by someone in the position to influence the ultimate decision maker relevant in an age-discrimination claim). Respondent needed to show only that her complaint was a contributing factor in Appellant's decision not to promote her. Templemire, 433 S.W.3d at 383. Further, we view all of the evidence in the light most favorable to the verdict, and here the jury found Respondent had met her burden. We will not disturb that finding. Giddens, 29 S.W.3d at 818.

*Additional Duties and Transfer to Kansas City*

Respondent also presented a submissible case that Appellant retaliated against her by adding additional duties to her workload and transferring her to Kansas City three days a week. As discussed above, Respondent only needed to show that her complaint was a contributing factor in Appellant's decision to add additional duties to her workload, and to transfer her to Kansas City three days a week, in order to meet her causation burden. Templemire, 433 S.W.3d at 383. As discussed above, because cases involving claims of retaliatory motive are inherently fact-based, usually depending on inferences rather than direct evidence, circumstantial evidence that "tends to support an inference" of retaliatory motive is sufficient. Holmes, 571 S.W.3d at 611. Some examples for circumstantial evidence of causation include good work record prior to the adverse employment action, close temporal proximity between the complaint and the adverse action, atypical treatment, and facts showing the employer's explanation for the action is unworthy of credence. Soto, 502 S.W.3d at 49-50.

Regarding Appellant's assigning additional duties to Respondent, the evidence at trial showed this was done at Hart's behest, after Respondent had filed her HR complaint against Hart. Moran testified on cross-examination that as part of the conclusion of the investigation into Hart's conduct, additional duties were added to Respondent's workload. Thus, there was

26

evidence of close temporal proximity between Respondent's first HR complaint and Appellant's decision to give her additional work duties. See id. Further, Williams testified that at the end of the investigation he spoke with Hart about Respondent's job responsibilities, and it was Hart's suggestion that Respondent did not have enough work to keep her busy. Williams testified further that as a result of that conversation, "more work was added to [Respondent's] plate." Both Moran and Williams testified that Respondent was not provided additional pay along with this increase in her workload. While Appellant argues that duties were also taken away from Respondent's workload, our standard of review requires we view the evidence in the light most favorable to the verdict reached by the jury, "giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." Giddens, 29 S.W.3d at 818. Here, the jury found Respondent showed Appellant's decision to add duties to her workload was in retaliation for her first HR complaint, and we decline to disturb that finding.

Respondent also provided a submissible case that her transfer to Kansas City was retaliatory. Appellant argues Respondent cannot prove a causal relationship between her HR complaint and her transfer to Kansas City because there was not a "close temporal relationship" between her complaint and her transfer. However, a close temporal relationship between a protected activity and the retaliatory act is only one of the ways a plaintiff can show causation. Here, regardless of whether Respondent showed a close temporal relationship between her complaint and transfer, she showed that Appellant's business reasons for the transfer were unworthy of credence.

Appellant's justification for transferring Respondent to Kanas City three days a week was that they needed her there to assist two supervisors in the construction department at the Kansas City office. Respondent called Williams to testify at trial, and he stated, "[Appellant] . . . wanted to accelerate our gas main program . . . We were averaging eight to ten miles a year until the

27

transition. They wanted us to immediately double and triple that . . . ." Williams testified further that "the construction foreman needed help with all the paperwork that was involved," and that was why Respondent was transferred to Kansas City. However, Williams also testified that Appellant dramatically increased the budget for this work, from $14 million to more than $40 million. Despite this budget increase and alleged need for support in the Kansas City office, Respondent was the only employee forced to commute to Appellant's Kansas City office. Additionally, Respondent testified that "there's no need for me to be in Kansas City. I can retrieve paperwork, emails, documents or a fax. We can get emailed to us the work order packet and not have to retrieve them off our database," and further that there is no aspect of her job duties in Kansas city requiring face-to-face interaction, or hands-on work. That Appellant had retaliatory intent in making this decision is further supported by the fact that Respondent was transferred after making her HR complaint, even though she was told before that complaint that her job would not change after Appellant's purchase of the company. The jury heard all of this testimony and then found in favor of Respondent. We will not disturb that finding. See Giddens, 29 S.W.3d at 818.

Additionally, Respondent showed that transfer is an atypical treatment at Appellant's offices. Soto, 502 S.W.3d at 49-50. Respondent testified that she had never heard of anyone being transferred from one of Appellant's offices for non-disciplinary reasons. In fact, as part of his punishment for his discriminatory conduct in the St. Joseph office, Hart was involuntarily transferred to Kansas City. Thus, Respondent also provided a submissible case that her transfer to Kansas City was in retaliation for her HR complaint.

Therefore, we hold that Respondent presented a submissible case that Appellant did not promote her to the claims supervisor position, added to her workload, and transferred her to Kansas City, all in retaliation for her HR complaint. As we discussed supra, because cases

28

involving claims of retaliatory motive are inherently fact-based, usually depending on inferences rather than direct evidence, circumstantial evidence that "tends to support an inference" of retaliatory motive is sufficient. Holmes, 571 S.W.3d at 611. Respondent's evidence tends to support an inference of retaliatory intent, in that she showed Dove was part of the group of decision-makers for the claims supervisor position and knew about her HR complaint, that she was only assigned additional duties at the behest of the same man against whom she filed her HR complaint, and that Appellant's justification for her transfer to Kansas City was pretextual. Point four is denied.

### Point V:  Instruction No. 6 Was Proper

In its fifth point on appeal, Appellant argues the trial court erred in giving Instruction No. 6 because it did not submit all of the elements of a hostile work environment claim.  Appellant asserts that the instruction should have required a finding that the alleged harassment was so severe or pervasive that it affected a term, condition, or privilege of Respondent's employment, and also a finding that Appellant knew or should have known of it.  We disagree.

When analyzing whether a jury was properly instructed, our review is conducted "in the light most favorable to the record," and if the instruction is supported by any theory its submission is proper.  Hervey, 379 S.W.3d at 159.  We reverse only if the instructional error resulted in prejudice that "materially affects the merits of the action."  The party challenging the instruction bears the burden of showing the instruction "misdirected, misled, or confused the jury, resulting in prejudice . . . ."  Id. (citing Fleshner v. Pepose, 304 S.W.3d 81, 90-91 (Mo. banc 2010)).

The Missouri Rules of Civil Procedure provide rules for the instruction of juries in Rule 70.02.  That rule states, "whenever [MAI] contains an instruction applicable in a particular case . . . such instruction *shall* be given *to the exclusion of any other instructions on the same*

29

*subject*." Mo. R. Civ. Pro. 70.02(b) (emphasis added). Rule 70.02 states further that "the giving of an instruction in violation of the provisions of [this rule] shall constitute error, its prejudicial effect to be judicially determined . . . ." Rule 70.02(c). A proper instruction submits "only the ultimate facts, not evidentiary details, to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another." Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co., 168 S.W.3d 488, 497-98 (Mo. App. E.D. 2005). Further, the test is "whether the instruction follows the substantive law and can be readily understood by the jury." Id. at 498.

Appellant faults Instruction No. 6 for numerous reasons. First, Appellant argues that the instruction failed to provide all of the elements of a hostile work environment claim, specifically that the trial court failed to provide the element that the harassment was sufficiently severe or pervasive that it affected a term, condition, or privilege of Respondent's employment, and also that the court failed to provide the element that Appellant knew or should have known of the harassment and failed to take proper action. We hold that this argument fails because Instruction No. 6 was proper in that it followed the applicable MAI, it submitted only the ultimate facts to the jury, and it followed the substantive law.

Employment discrimination actions brought before the S.B. 43 amendments utilize MAI 38.01(A). That MAI reads as follows:

> Your verdict must be for plaintiff if you believe:
>
> First, defendant (here insert the alleged discriminatory act, such as 'failed to hire' 'discharged' or other act within the scope of [Section] 213.055, RSMo) plaintiff, and
>
> Second, (here insert one or more of the protected classifications supported by the evidence such as race, color, religion, national origin, sex, ancestry, age, or disability) was a contributing factor in such (here repeat alleged discriminatory act . . .), and
>
> Third, as a direct result of such conduct, plaintiff sustained damage.

MAI 38.01(A). Instruction No. 6 read in pertinent part:

30

Your verdict must be for Plaintiff on her race discrimination claim if you believe:

First, Defendants either

Subjected Plaintiff to unwelcome harassment that either created an intimidating, hostile, or offensive work environment or unreasonably interfered with her work performance, or

Failed to promote Plaintiff to Claims Supervisor, and

Second, Plaintiff's race was a contributing factor in such conduct, and

Third, as a direct result of such conduct, Plaintiff sustained damage.

Looking at the MAI language and the language from Instruction No. 6, it is clear the trial court religiously followed the MAI instruction, as it was required to do.  See Clark v. Missouri & N. Ark. R.R. Co., Inc., 157 S.W.3d 665, 671 (Mo. App. W.D. 2004) (finding that it is well settled that when a MAI instruction is applicable, its use is mandatory) (quoting Bueche v. Kansas City, 492 S.W.2d 835, 840 (Mo. banc 1973)); see also Brown v. St. Louis Pub. Serv. Co., 421 S.W.2d 255, 258 (Mo. banc 1967) ("if this court is to make this system work, and preserve its integrity and very existence, we must insist that mandatory directions be followed and that the pattern instructions be used as written").

Instruction No. 6 was also proper because it submitted only the ultimate facts to the jury. J.E. Jones Const. Co., 168 S.W.3d at 497-98.  MAI 38.01(A) instructs the trial court to "insert the alleged discriminatory act . . . within the scope of [Section] 213.055" in Paragraph First of the instruction.  MAI 38.01(A).  Further, the Notes on Use provide that the trial court can appropriately modify Paragraph First of the instruction "if the evidence . . . demonstrates a course of conduct or harassment constituting discrimination on any grounds contained in [Section] 213.055 . . . ."  MAI 38.01(A); Clark, 157 S.W.3d at 671 (finding that notes on use should be religiously followed).  Thus, the Notes on Use to MAI 38.01(A) provide that in hostile

31

work environment claims, the trial court must insert language in Paragraph First providing the ultimate facts the jury must find.

We have already discussed in our analysis of Appellant's third and fourth points, supra, why its conduct was sufficiently severe and pervasive to create a hostile work environment. In Missouri, "discrimination creates an actionable hostile work environment when discriminatory conduct either creates an intimidating, hostile, or offensive work environment or has the purpose or effect of unreasonably interfering with an individual's work performance." Fuchs, 447 S.W.3d at 733. Under Missouri law, then, an intimidating work environment, a hostile work environment, an offensive work environment, or an environment that unreasonably interferes with someone's work performance are all actionable forms of discrimination, and by their very nature constitute discrimination that is severe and pervasive. Thus, these were the ultimate facts that needed to be submitted to the jury. See id. Instruction No. 6 submitted all of these to the jury, and thus submitted the ultimate facts to the jury.

For similar reasons, Instruction No. 6 was also proper because it followed the substantive law. The court followed the Notes on Use from MAI 38.01(A) to fill in the ultimate facts in Paragraph First of Instruction No. 6. Further, the court took the language directly from the Fuchs case. See id. When discussing the jury instructions with the attorneys, the court mentioned that there was "not a definition of hostile work environment," so ". . .we took the language directly from that case and inserted into the verdict director . . . [t]hat is right from that case, and that's as close a definition as I could find . . . so I think that is the proper guidance for the jury . . . ." Thus, the trial court followed the substantive law, in that it followed the applicable MAI and Notes on Use, and took the definition of a hostile work environment directly from an applicable case.

32

Even assuming *arguendo* Instruction No. 6 was improper for failing to submit all of the elements of a hostile work environment, Appellant still cannot show prejudice because the jury awarded punitive damages. A jury's decision to award punitive damages on a hostile work environment claim "indicates the discriminatory harassment was severe and pervasive, and indicates that the addition of [the words severe and pervasive] in [the] jury instruction . . . would not have made a difference." Alhalabi, 300 S.W.3d at 528. Thus, Appellant was not prejudiced by the lack of such language in Instruction No. 6.

Next, Appellant faults Instruction No. 6 for not requiring the jury to find Appellant "knew or should have known of the alleged hostile environment and did nothing about it." Appellant asserts this is a valid defense to claims of harassment by supervisors and co-employees. To begin with, the argument was waived. Rule 70.03 addresses objections to instructions, stating "[c]ounsel **shall** make specific objections to instructions considered erroneous," and requiring counsel "objects thereto on the record **during the instructions conference**, stating distinctly the matter objected to and the grounds of the objection." Rule 70.03 (emphasis added). Failure to make such an objection means that argument is waived on appeal. See Williams v. Mercy Clinic Springfield Cmtys., 568 S.W.3d 396, 415 (Mo. banc 2019). Appellant failed to make this specific objection at the instructions conference, instead objecting to the lack of the "severe and pervasive" language in the instruction, and the trial court's rejection of its affirmative defense instruction. Further, Appellant's proposed hostile work environment instruction did not include such a defense. Additionally, Appellant failed to include this argument in its motion for a new trial. Thus, Appellant waived this argument.

Even if Appellant properly preserved this argument for our review, it still fails because this proposed element is applicable only to cases involving sexual harassment, and only when the plaintiff seeks to hold the employer liable under a negligence theory of liability. See Diaz v.

33

Autozoners, LLC, 484 S.W.3d 64, 76 (Mo. App. W.D. 2015). This is a case of racial discrimination, thus Appellant's argument that Instruction No. 6 failed to include such an element fails.

Appellant also faults the trial court for rejecting Appellant's affirmative defense instruction. This proposed instruction read in pertinent part:

> You must find for Defendants on Plaintiff's racial [sic] hostile work environment claim if you believe:
>
> First, Defendants exercised reasonable care to prevent harassment in the workplace on the basis of race, and also exercised reasonable care to promptly correct any harassing behavior that does [sic] occur, and
>
> Second, Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities approved by Defendants.

This defense is available only where "**no tangible employment action occurs**," and requires "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff . . . unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm . . . ." Diaz, 484 S.W.3d at 76 (emphasis added).

Appellant's argument fails for two reasons. First, this affirmative defense is only available in sexual harassment cases. The MHRA does not "explicitly provide for . . . any . . . affirmative defense." Wells v. Lester E. Cox Med. Ctrs., 379 S.W.3d 919, 926 (Mo. App. S.D. 2012); see also MAI 38.01(A) Notes on Use 4 ("in including guidance on how to instruct in instances where an affirmative defense is submitted, the Committee takes no position as to the availability of affirmative defenses in [MHRA] cases") (citing id.) However, the Missouri Code of State Regulations provides that this affirmative defense is available in sexual harassment cases. 8 CSR Section 60-3.040(17)(D)(1). There is no such regulation providing for such a defense in the context of a racial discrimination case. Further, this affirmative defense is only

34

available where there is no tangible employment action.  See Diaz, 484 S.W.3d at 76 ("this defense is **not available**, however, when the supervisor's harassment culminates in a tangible employment action") (internal quotations omitted) (emphasis added).  We have already discussed how Appellant's actions culminated in multiple tangible employment actions.  Thus, the trial court was correct when it denied Appellant's proposed affirmative defense instruction because it was inapplicable to this case.

For these reasons, we hold that Instruction No. 6 was proper and the trial court properly rejected Appellant's affirmative defense.  Appellant's fifth point is denied.

## Points II and VI

Appellant's second and sixth points are reviewed for an abuse of discretion, thus we review them separately from the rest of Appellant's points.

A.  Standard of Review

The trial court has "broad discretion" in determining whether to admit or exclude evidence.  Kerr v. Mo. Veterans Comm'n, 537 S.W.3d 865, 876 (Mo. App. W.D. 2017) (internal quotations omitted) (citing Ferguson, 498 S.W.3d at 489).  Thus, we review the trial court's decisions regarding the admission of evidence for an abuse of discretion.  Id. at 877.  Additionally, to successfully challenge the trial court's award of attorneys' fees on appeal, the appellant must show the award was an abuse of discretion.  Cullison v. Thiessen, 51 S.W.3d 508, 513 (Mo. App. W.D. 2001).  The trial court abuses its discretion "if its ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration."  Kerr, 537 S.W.3d at 876. (internal quotations omitted).

B.  Analysis

**Point II:  The Trial Court did not Abuse its Discretion in Admitting Respondent's "Me too" Evidence**

In its second point on appeal, Appellant argues the trial court erred in admitting Respondent's "me too" evidence in support of her hostile work environment claim. Appellant reasons that such evidence was irrelevant because the allegedly hostile remarks were neither directed to, nor heard by plaintiff, and the prejudicial effect of such evidence far outweighed any probative value. We disagree.

Employment discrimination cases are inherently fact based, and "often depend on inferences rather than on direct evidence . . . because employers are shrewd enough not to leave a trail of direct evidence." Cox, 473 S.W.3d at 116. Thus, "individual plaintiffs claiming discriminatory employment action on the basis of . . . any . . . protected classification, generally must rely on circumstantial evidence." Id. As with all other forms of evidence, circumstantial evidence of employment discrimination must be both logically and legally relevant to be admissible. Id. Evidence is logically relevant if "it tends to make the existence of any consequential fact more or less probable, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case." Hesse v. Mo. Dept. Corr., 530 S.W.3d 1, 5 (Mo. App. W.D. 2017). Evidence is legally relevant if "its probative value outweighs any prejudicial effect on the jury." Id.

Appellant challenges the admission of the following evidence: (1) Rumbo's testimony that Hart told him to "turn that jigaboo music off" in the St. Joseph facility; (2) Rumbo's testimony recounting a conversation with Mark Olvera ("Olvera") in which he stated that St. Joseph "don't do blacks and women"; (3) Katie Jones Shirey's ("Shirey") testimony regarding Hart's jigaboo comment, and that Hart used the word "n****r" more than once; (4) Gard's testimony that he heard Martin refer to President Obama as a "f*****g monkey," and that Martin had used the n-word on multiple occasions; (5) Phil Campbell's ("Campbell") testimony that Hart told other employees that they "n****r-rigged the cards"; and (6) D'Angelo Ferguson's

("Ferguson") testimony that Shane Mitchell ("Mitchell"), who worked under Hart's supervision, referred to "jigaboo music" many times. The crux of Appellant's argument is that because Respondent did not hear many of the statements which these "me too" witnesses testified, they are irrelevant to her hostile work environment claim. This is not the law.

To be sure, the testimony of these witnesses was logically relevant to Respondent's hostile work environment claim. She was alleging that the racism of her supervisor and colleagues created a racially hostile work environment. The fact that Hart, Martin, and other Caucasian employees repeatedly used racial slurs makes it more probable that this was the case. Hesse, 530 S.W.3d at 5 (noting that evidence is logically relevant if it makes any consequential fact more or less probable). Further, this corroborated Respondent's own testimony about the racial hostility she experienced in the workplace. Respondent described the workplace as "toxic," and that the environment "made it difficult to work." She testified about her first day in the St. Joseph office, where she overheard two Caucasian employees talking about how "blacks don't take pride in their work, where they live, or anything," that she heard co-employees refer to President Obama as a "f*****g monkey," and that Martin would walk into the office mockingly singing "negro spirituals." Respondent also testified that Hart tried to make her appear incompetent, alleging her co-workers were complaining, and that Hart never degraded any of the Caucasian employees like he did Respondent. Additionally, Respondent testified that when she filed her HR complaint she was questioned about whether she was having an intimate relationship with Gard, a Caucasian co-worker. Thus, the testimony of these "me too witnesses" was logically relevant to Respondent's hostile work environment claim. The principal issue is whether this testimony was legally relevant.

When considering "me too" evidence, "courts look to and weigh aspects of similarity between party and non-party employees given the facts, context, and theory of the specific case

37

at issue." Id. (quoting Cox, 473 S.W.3d at 123). Further, "there is no one set of agreed-upon factors, and no one factor is dispositive." Dixson, 586 S.W.3d at 830 (internal quotations omitted) (quoting Cox, 473 S.W.3d at 122). We find the case of Cox v. Kansas City Chiefs Football Club, Inc., instructive to our analysis on this issue. 473 S.W.3d at 107. In that case, Cox ("Mr. Cox") was a former Chiefs employee who filed an age-discrimination suit against the team after he and a number of employees over the age of fifty were fired and replaced with younger people. Id. at 111-12. The trial court ruled that the testimony of other former employees as to their ages and the circumstances surrounding their termination was inadmissible because the other employees "were . . . fired or forced out by different managers and worked in different departments, among other distinctions," and were therefore not similarly situated to Mr. Cox. Id. at 111.

On transfer from the Western District, the Missouri Supreme Court held that the trial court abused its discretion in excluding this circumstantial evidence, noting that the "standard for admitting such testimony as circumstantial evidence of the employer's discriminatory intent . . . depends on may factors, including the plaintiffs [sic] circumstances and theory of the case." Id. Further, the Court discussed that the admissibility of such evidence should be determined "on a case-by-case basis." Id. at 121. The Court also held that evidence of discriminatory actions at the hands of other decisionmakers is admissible if "relevant to the plaintiffs [sic] circumstances and theory of the case . . . ." Id. at 123. Then, looking at Mr. Cox's theory of the case, the court found the trial court abused its discretion in not admitting the "me too" evidence at issue. Id.

Looking to the facts and circumstances of this case, and in light of Respondent's theory of the case, we hold the trial court did not abuse its broad discretion in admitting the testimony of the "me too" witnesses. While the circumstances for Rumbo, Shirey, Gard, Campbell, and Ferguson were not similar in every way to Respondent's situation, their differences were "less

relevant than their commonalities." See Dixson, 586 S.W.3d at 831 (quoting Hesse, 530 S.W.3d at 5). Rumbo, Campbell, and Ferguson were all African-Americans employed at the same company, who all experienced racially hostile conduct, including actions by Hart, those under his supervision, and Martin. Further, while Campbell and Shirey were Caucasian, they also experienced much of the same conduct by the same parties, and Gard was even viewed as being too friendly with Respondent, to the extent that the parties at fault accused Respondent of having an intimate relationship with him. As the court in Cox held, these similarities made this "me too" evidence "relevant and admissible in this case even when the other . . . employees are not similarly situated in all respects." 473 S.W.3d at 111. Therefore, in addition to being logically relevant, this evidence was also legally relevant and admissible.

That the trial court did not abuse its discretion in admitting this evidence is further supported by examination of the evidence it found inadmissible. First, the trial court sustained Appellant's counsel's objection to Shirey's testimony that Campbell's Caucasian co-workers viewed him as lazy. Further, the court refused to admit Campbell's evidence about his claim to the Equal Employment Opportunity Commission regarding seniority issues, finding "this is certainly an insufficient connection." Thus, it cannot be said that the trial court's decision was "so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Kerr, 537 S.W.3d at 876.

Therefore, the trial court did not abuse its discretion in admitting this "me too" evidence, and point two is denied.

**Point IV: The Trial Court did not Abuse its Discretion in Awarding Respondent Attorneys' Fees**

In its sixth and final point on appeal, Appellant alleges the trial court erred in awarding Respondent attorneys' fees, because the award was premature. Appellant reasons that because an outright reversal on appeal would require a denial of attorneys' fees, and a reversal on any

39

ground other than the damage cap would require a new trial, the trial court abused its discretion in awarding Respondent attorneys' fees. We disagree.

The MHRA provides that "the court may . . . as it deems appropriate . . . award court costs and reasonable attorney fees to the prevailing party other than a state agency or commission or a local commission . . . ." Section 213.111.2. The determination of reasonable attorneys' fees is "in the sound discretion of the trial court," and we will reverse only where the amount is "arbitrarily arrived at or is so unreasonable as to indicate indifference and a lack of proper judicial consideration." Brady v. Curators of Univ. of Mo., 213 S.W.3d 101, 114 (Mo. App. E.D. 2006). Further, if the trial court determines a plaintiff has prevailed, it should award attorneys' fees "unless special circumstances would render such an award unjust." Id. at 115 (quoting Lippman v. Bridgecrest Estates I Unit Owners Ass'n, Inc., 4 S.W.3d 596, 598 (Mo. App. E.D. 1999)). Such an exception is "extremely narrow," and is applied only "in unusual circumstances and then only upon a strong showing by the party asserting it." Id.

In its principal brief on appeal, Appellant indicates that the award of attorneys' fees was improper only if this Court reverses on other grounds. From pages 73-74 of that brief, Appellant states, "if [Appellant] prevails on any of its arguments that plaintiff lacked a submissible case on any theory, [Appellant] is entitled to a new trial on all issues. **In those circumstances**, any award of attorneys' fees would have to await the outcome of a new trial." Further, in its reply brief, Appellant states, "[t]he parties are in agreement that the issue of attorneys' fees depends on the outcome of the appeal." Seeing no errors warranting reversal, we cannot hold that the trial court abused its broad discretion in awarding attorneys' fees to Respondent. Point six is denied.

*Respondent's Motion for Attorneys' Fees on Appeal*

We now address Respondent's Motion for Attorneys' Fees on Appeal. Respondent filed this Motion on September 27, 2019, requesting this Court "award her attorney's fees, expenses,

40

and costs on appeal should the Court deem her a prevailing party." The Motion did not request a specific amount of fees, but requested that this Court "permit her to provide supplemental documentation in support of this motion when the work on the appeal is complete." On October 7, 2019, this Motion was ordered taken with the case.

Section 213.111 authorizes a court to award "court costs and reasonable attorney fees to the prevailing party." Section 213.111.2; Dixson, 586 S.W.3d at 831. This includes fees incurred on appeal from the trial court's judgment. Mignone v. Mo. Dep't of Corr., 546 S.W.3d 23, 45 (Mo. App. W.D. 2018). The prevailing party is "one that succeeds on any significant issue in the litigation which achieved some of the benefit the parties sought in bringing the suit." Id. Because we affirm the trial court's judgment in Respondent's favor, she is the prevailing party and is entitled to an award of costs and reasonable attorneys' fees incurred on appeal. See id.; see also Dixson, 586 S.W.3d at 831. While this Court has the authority to allow and fix the amount of attorneys' fees on appeal, "we exercise this power with caution believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." Accordingly, we grant Respondent's Motion for Attorneys' Fees on Appeal, and remand the case to the trial court to hear evidence and argument on this issue, and to determine the appropriate fee.

### III. Conclusion

The judgment of the trial court is affirmed. In granting Respondent's motion for attorneys' fees, we remand to the trial court to determine the appropriate fee.

_____
ROY L. RICHTER, Judge

Robert M. Clayton III, P.J., concurs
Robert G. Dowd, Jr., J., concurs

41